UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Beverly Arlene Moraine,

       Plaintiff,

vs.                                                          REPORT AND RECOMMENDATION

Social Security Administration,

       Defendant.                    Civ. No. 08-5982 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's final decision which denied her application for Disability Insurance Benefits ("DIB"). The matter is now before the Court on the parties' cross-Motions for Summary Judgment. The Plaintiff appears pro se, and the Defendant appears by Lonnie F. Bryan, Assistant United States Attorney. For reasons which follow, we recommend that the parties cross-Motions for Summary Judgment be denied, and that this matter be remanded to the Commissioner for further proceedings, not inconsistent with this Report.

## II. Procedural History

The Plaintiff applied for DIB on March 26, 2007, at which time, she alleged that she had become disabled on March 6, 2007. [T. 9, 128, 130]. The Plaintiff's date, on which she was last insured for DIB, was September 30, 2008. [T. 9, 131]. Her claim was denied upon initial review, and upon reconsideration. [T. 9, 45-54]. The Plaintiff timely requested a Hearing before an Administrative Law Judge ("ALJ") and, on June 18, 2008, a Hearing was conducted, during which the Plaintiff appeared personally, and by Laura K. Ross, Esq. [T. 9, 22-44]. Thereafter, on July 19, 2008, the ALJ issued a decision, which denied the Plaintiff's claim for benefits. [T. 6-17]. The Plaintiff requested an Administrative Review before the Appeals Council, and on September 22, 2008, the Appeals Council declined to review the matter further. [T. 1-5, 18-21]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997).

Although not formally a part of the Record, it appears that the Plaintiff filed a second application for DIB, which was approved on the initial level of review. See, Plaintiff's Motion for Summary Judgment, Docket No. 24, at p. 3 of 3. The

Commissioner advises that the official records reflect that the Plaintiff filed a second application for DIB on November 13, 2008, which was granted at the initial level of administrative review, based upon a finding that the Plaintiff became disabled on July 18, 2008, which is the date that the Plaintiff identified as the alleged onset date in her application, and which is one (1) day before the date of the ALJ's Decision in this case. See, Defendant's Memorandum in Support of Motion for Summary Judgment, ("Defendant's Memorandum"), Docket No. 30, at p. 23 of 24. We make note of this procedural development only to be satisfied that we have continued jurisdiction over the subject matter of this action and, concluding that a period of disability remains in dispute, we are satisfied that we continue to be presented with an actual "case or controversy." See, e.g., Defenders of Wildlife, Friends of Animals and Their Environment v. Hodel, 851 F.2d 1035, 1038 (8th Cir. 1988)("Article III of the Constitution limits the power of the federal courts to actual 'cases' and 'controversies.'"), citing United States Constitution, Article III, Section 2; see also, McClain v. American Economy Ins. Co., 424 F.3d 728, 731 (8th Cir. 2005), quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)("[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.").

### III.  Administrative Record

A.  <u>Factual Background</u>.  The Plaintiff was fifty (50) years old on the alleged onset date.  [T. 15].  The Plaintiff graduated from high school, had two (2) years of post-secondary education, and has past work experience as an accounting clerk and personnel recruiter.  <u>Id.</u>  As related by the Plaintiff, she stopped working on or about March 6, 2007, due to her disability.

1.  <u>Medical Records</u>.  On April 3, 2006, the Plaintiff was seen at the Apple Valley Medical Center ("AVMC"), for complaints of headaches and a sore throat.  [T. 267].  She was tested for Strep throat, which came back negative.  [T. 281]. Shortly thereafter, on April 21, 2006, the Plaintiff presented at AVMC with complaints of a sore throat.  [T. 266].

On May 24, 2006, the Plaintiff saw Dr. Reetu Syal for hot flashes, fatigue, and symptoms of menopause.  [T. 297].  Dr. Syal noted that the Plaintiff had underwent

a vaginal hysterectomy one (1) year earlier, that the Plaintiff was taking Lexapro,[1] and that she had a history of gestational diabetes.  Id.  The Plaintiff advised that she wished to proceed with hormone replacement therapy to treat her menopausal symptoms, and Dr. Syal prescribed Premarin at that time.[2]  Id.  Dr. Syal also ordered hemoglobin and thyroid tests, so as to rule out other possible sources of the Plaintiff's fatigue.  Id.

The Plaintiff was seen by Dr. Ingrid Wilbrand-Conley on August 22, 2006, for symptoms of menopause and significant hot flashes, which had improved slightly since she started taking Premarin, but she reported that she was experiencing nausea during hot flashes. [T. 296].  Dr. Wilbrand-Conley observed that the Plaintiff was well-developed, well-nourished, and in no acute distress.  Id.  The Plaintiff further reported that she was experiencing a lot of stress in her life, which had contributed to a slow increase in her weight over the last few years.  Id.  Dr. Wilbrand-Conley

---

[1]Lexapro is a selective serotonin reuptake inhibitor (SSRI),"which is indicated for the acute and maintenance treatment of major depressive disorder in adults * * * [and] for the acute treatment of Generalized Anxiety Disorder (GAD) in adults." Physicians' Desk Reference, at 1161 (64th Ed. 2010).

[2]Premarin is indicated for the "[t]reatment of moderate to severe vasomotor symptoms due to menopause."  Physicians' Desk Reference, at 3537 (64th Ed. 2010).

ordered a TSH cascade, and hemoglobin and glucose tests, and advised the Plaintiff to contact her primary care physician if her stress increased.  Id.  She was also prescribed Climara.[3]  Id.

On September 29, 2006, the Plaintiff saw Dr. Wilbrand-Conley for her annual examination, at which time, the Plaintiff reported that her stress level continued to increase, that she had "a lot of things going on in her life," and that the Lexapro was helping, but it was not completely addressing her stress level.  [T. 294].  The Plaintiff reported several bouts of abdominal pain, which was associated with diarrhea, over the last couple of months which, at times, required up to seven (7) trips to the bathroom.  Id.  Dr. Wilbrand-Conley believed that the Plaintiff might have irritable bowel syndrome ("IBS"), and recommended that she set up a consultation with a gastroenterologist for a colonoscopy, so as to evaluate the Plaintiff for the existence of IBS.  Id.  Dr. Wilbrand-Conley also recommended that the Plaintiff quit smoking and decrease her use of caffeine.  Id.

Dr. Patrick M. O'Reilly saw the Plaintiff on October 5, 2006, following a referral from Dr. Wilbrand-Conley for diarrhea and abdominal pain. [T. 308].  The

---

[3]Climara is used for the "[t]reatment of moderate to severe vasomotor symptoms associated with the menopause." Physicians' Desk Reference, at 843 (64th Ed. 2010).

Plaintiff told Dr. O'Reilly that, on July 2, 2006, her mentally ill sister came to her house and threatened to kill her. Id. The Plaintiff's sister remained at the house for about forty-five (45) minutes and, upon leaving, she drove into a police car. Id. The Plaintiff reported that, ever since that day, she has had abdominal pain and diarrhea, typically seven (7) or eight (8) times per day. Id. The Plaintiff described cramping pain in the lower abdomen, intermittent sharp left lower quadrant pain, gas and bloating, incomplete evacuation, and relief from the abdominal pain following a bowel movement. Id. The Plaintiff further reported that the intake of any food or drink resulted in prompt diarrhea. Id. Other symptoms included increased weakness and dizziness, increased difficulty sleeping, and nightmares. Id.

The Plaintiff was not in acute distress, and a physical examination was normal, with Dr. O'Reilly noting that her abdomen was soft, nontender, and nondistended, and that her bowel sounded normal. Id. Dr. O'Reilly observed that the Plaintiff had not lost any weight and had, in fact, gained five (5) to six (6) pounds. Id. He believed that the Plaintiff may have post traumatic stress disorder ("PTSD"), as a result of the incident with her sister. Id. Dr. O'Reilly further observed that the Plaintiff was exhibiting symptoms of irritable bowel syndrome, and opined that she may have underlying etiologies, such as colitis or infection. Id. He ordered stool cultures and

laboratory work, and concluded that, if the results of those tests turned out to be unremarkable, then a colonoscopy would be ordered. [T. 308-309]. On October 12, 2006, the Plaintiff presented with complaints of diarrhea and abdominal pain of unknown etiology, at which time Dr. Arnold M. Brier performed a colonoscopy and rectal biopsy. [T. 299, 307]. Dr. Lisa L. Lyons, who was the attending pathologist, concluded that the results appeared typical of the collagenous colitis form of microscopic colitis.[4] [T. 299]. Dr. Lyons advised that the diagnosis would be further supported if there was a history of chronic, watery diarrhea. Id. Thereafter, on October 24, 2006, Dr. Brier diagnosed the Plaintiff with microscopic colitis. [T. 263].

On October 27, 2006, the Plaintiff saw Amy C. Heilman, P.A.-C. ("Heilman"), for a followup regarding her recent diagnosis of microscopic colitis. [T. 305-306]. Heilman noted that the Plaintiff had a history of diarrhea since July, which the Plaintiff reported as occurring between two (2) and twelve (12) times daily, with

---

[4]Collagenous colitis is a type of inflammation of the colon of an unknown etiology, which is "characterized by deposits of collagenous material beneath the epithelium of the colon, with crampy abdominal pain and marked reduction in fluid and electrolyte absorption, leading to watery diarrhea[.]" Dorland's Illustrated Medical Dictionary, at 390 (31st Ed. 2007). Microscopic colitis is "a form similar to collagenous colitis but without deposits in the subepithelial region; marked reduction in fluid absorption is present, with chronic diarrhea and without ulceration." Id.

cramping. [T. 305]. Heilman noted that the Plaintiff was previously taking NSAIDs, but had recently switched to Tylenol, that laboratory testing and stool cultures were normal, and that the Plaintiff was currently taking Lexapro and Prempro.[5] Id. She prescribed Asacol as a treatment for the collagenous colitis, advised the Plaintiff to limit intake of caffeine and dairy products, and directed the Plaintiff to follow up with her in two (2) to three (3) months for a reassessment of her symptoms.[6]

The Plaintiff sought urgent care treatment at AVMC on December 6, 2006, with complaints of swollen hands, mouth and throat, and facial tingling and, while there, she was seen by Dr. Decker. [T. 275]. The Plaintiff reported that she was taking Entocort, Asacol, Lexapro, and Premarin, and a medical history of microscopic colitis and depression were noted.[7] Id. A review of the Plaintiff's systems revealed that the

_____

[5]An NSAID is a nonsteroidal anti-inflammatory drug. Dorland's Illustrated Medical Dictionary, at 1312 (31st Ed. 2007). Prempro is indicated for the "treatment of moderate to severe vasomotor symptoms due to menopause." Physicians' Desk Reference, at 3553 (64th Ed. 2010).

[6]Asacol is "indicated for the treatment of mildly to moderately active ulcerative colitis and for the maintenance of remission of ulcerative colitis." Physicians' Desk Reference, at 2786 (64th Ed. 2010).

[7]Entocort is the trademark name for a preparation of budesonide, which is "an antiinflammatory glucocorticoid used by inhalation to treat asthma, intranasally to treat allergic rhinitis and other inflammatory nasal conditions, rectally to treat ulcerative colitis and orally to treat Crohn disease." Dorland's Illustrated Medical

Plaintiff was experiencing red, burning eyes, swelling and tingling in the throat, shortness of breath, nausea and dizziness. Id. The Plaintiff believed that Entocort was causing an allergic reaction, and Dr. Decker noted that she looked extremely agitated, but that he observed no problems with speaking or breathing. [T.276]. Dr. Decker strongly doubted that the Plaintiff was experiencing an allergic reaction, but he prescribed Benadryl.[8] Id.

Dr. Wilbrand-Conley saw the Plaintiff for a reevaluation on December 21, 2006, at which time, she noted the Plaintiff's recent diagnosis of microscopic colitis following complaints of persistent diarrhea. [T. 293]. Dr. Wilbrand-Conley noted that the Plaintiff was currently taking Lexapro and Premarin, and that she had been treating the microscopic colitis with Asacol and Entocort, with some improvement to her symptoms of abdominal pain and diarrhea, but that those medications were discontinued due to side effects. Id. The Plaintiff reported that she was currently asymptomatic, and that she was not having any problems with diarrhea or cramping pain. Id.

---

Dictionary, at 261, 634 (31st Ed. 2007).

[8]Benadryl is an antihistamine, which is used for the temporary relief of "symptoms due to hay fever of other upper respiratory allergies * * * [and] symptoms due to the common cold." Physicians' Desk Reference, at 2042 (64th Ed. 2010).

On December 26, 2006, the Plaintiff presented at AVMC urgent care with a sore throat that had lasted approximately two (2) weeks. [T. 272]. The Plaintiff reported symptoms of nasal congestion, ear pain, cough, and headache. [T. 272, 274]. The Plaintiff also reported that she was taking Lexapro, Premarin, and that she had just finished taking Entocort. [T. 272]. The Plaintiff was advised to get plenty of rest and fluids. Id.

Shortly thereafter, on January 4, 2007, Dr. John E. English, who was the Plaintiff's primary care physician, saw the Plaintiff for a consultation regarding her recent diagnosis of microscopic colitis, and because she had seen no improvement in the sore throat, headache, and cough, since she was seen in the urgent care clinic the previous week. [T. 269, 277-280]. Dr. English ordered a number of laboratory tests. [T. 277-280].

On January 26, 2007, the Plaintiff presented at AVMC for complaints of a sinus infection, which was not going away with medication. [T. 268]. Dr. English also ordered x-rays of the Plaintiff's right shoulder following a fall, which revealed no definite evidence of an acute fracture or dislocation. [T. 330].

Dr. Wilbrand-Conley saw the Plaintiff on March 8, 2007, at which time, the Plaintiff reported lumps in her breasts. [T. 298]. Dr. Wilbrand-Conley ordered a

mammogram, and Dr. Frank P. Maguire concluded that the results were normal, with no signs of malignancy.  Id.

Dr. Hansen saw the Plaintiff on March 15, 2007, for a followup visit on her diagnosis of microscopic colitis.  [T. 301]. Dr. Hanson noted a past medical history of hysterectomy, tonsillectomy, and no known family history of gastrointestinal malignancies.  Id.  The Plaintiff was in no acute distress, had a regular heart rate and rhythm, and she exhibited an appropriate mental status and normal gait.  Id. The Plaintiff reported that she had not felt well since the previous Summer.  Id.  Dr. Hansen noted that the Plaintiff had tried Asacol, which did not help, and that she had also tried Entocort, which had improved her symptoms, but that she had stopped using it after three (3) weeks, due to a funny sensation in her tongue.  Id.

Since the Plaintiff began using Asacol again, her stools had worsened, and she was feeling fatigue and malaise, and she reported that it had gotten so bad that "it is actually affecting her job, to the point where she lost her job yesterday."  Id.  Dr. Hanson noted that the Plaintiff was experiencing stress and situational depression as a result, and that she had not noticed significant depression before her illness began in the Summer.  Id.  The Plaintiff's weight remained stable.  Id.  Dr. Hanson advised the Plaintiff to follow up with her primary care physician within the next month,

before returning to see him in one (1) month's time. [T. 301-302]. Dr. Hansen discontinued Asacort, prescribed Entocort, and told the Plaintiff to report back to him if her symptoms worsened, or if she was unable to tolerate the Entocort. [T. 302].

On April 24, 2007, Dr. Hanson saw the Plaintiff again, at which time, the Plaintiff presented as stressed and tearful, with complaints of joint aches, headache, weakness, and nausea. [T. 334]. The Plaintiff was taking Ensure, Entocort, Premarin, and Lexapro. Id. Dr. Hansen noted that the Plaintiff had experienced significant stressors in the past year, and that he believed that her psychosocial stressors were playing a role in her physical illness. Id. He further noted that the Plaintiff had not shared her personal situation with any of her other health care providers. Id. Dr. Hanson advised the Plaintiff to contact a psychologist to discuss cognitive and drug therapy, and opined that he didn't think Lexapro was the best drug for her. [T. 334-335]. Dr. Hanson prescribed Questran, and ordered a CT scan of the Plaintiff's abdomen, which revealed normal results.[9] [T. 335-336].

The Plaintiff saw Stephen M. Hjemboe, Ph.D., L.P., a couple of days later, on April 26, 2007, for treatment of PTSD stemming from the incident with her sister,

---

[9]Questran is a trademark for preparations of cholestyramine resin, which is used "to treat diarrhea due to excess bile acids in the colon." Dorland's Illustrated Medical Dictionary, at 1590, 1650 (31st Ed. 2007).

occurring during the Summer of 2006. [T. 366-372]. The Plaintiff related symptoms of intense fear, guilt, muscle and joint pain, headaches, and fatigue. [T. 366]. The Plaintiff reported prescriptions for Imipramine, Provigil, Lexapro, Premarin, and Entocort.[10] [T. 367].

As related by the Plaintiff, she was experiencing symptoms of mild depression, insomnia, decreased interest in activities, decreased energy, increased sexual problems, decreased concentration, memory problems, crying, panic attacks, dizziness, anxiety, and nightmares. [T. 369-370]. Dr. Hjemboe concluded that the Plaintiff's complaints were consistent with post traumatic stress disorder ("PTSD"). [T. 370]. The Plaintiff saw Dr. Hjemboe again on May 2, 2007, and May 9, 2007, for additional counseling sessions related to her symptoms of PTSD. [T. 364-365].

The Plaintiff was seen by Stephanie Elko, P.A.-C ("Elko"), on May 24, 2007, for a follow-up visit regarding her collagenous colitis diagnosis, at which time, she

---

[10]Imipramine is "a tricyclic antidepressant of the dibenzazepine class, the first of the tricyclic antidepressants to be used." Dorland's Illustrated Medical Dictionary, at 929 (31st Ed. 2007).

Provigil "is indicated to improve wakefulness in adult patients with excessive sleepiness associated with narcolepsy, obstructive sleep apnea/hypopnea syndrome, and shift work sleep disorder." Physicians' Desk Reference, at 985 (64th Ed. 2010).

presented with continued complaints of "muscle aches, joint aches, fatigue, nausea with emesis, weakness and headaches." [T. 332-333]. The Plaintiff reported prescriptions for Entocort, Questran, Premarin, and Lexapro. [T. 333]. The Plaintiff's bowel movements had improved, with only approximately three (3) per day, but she was still reporting occasional abdominal pain in the form of a dull ache. [T. 332].

Elko noted that, on her prior visit of April 24, 2007, the Plaintiff reported complaints of joint aches, muscle aches, headaches, weakness, and nausea, and that she was having five (5) to eight (8) bowel movements a day. Id. Elko noted that the Plaintiff had been experiencing significant stress in her life over the past year, and that Dr. Hanson had referred her to a psychologist to help with her stress and depression and, at that time, he felt that several of her physical symptoms were secondary to her stress. Id. Elko concluded that the Plaintiff was experiencing improved bowel movements, and that she was dealing well with psychosocial stressors. [T. 333].

The Plaintiff exhibited right upper quadrant discomfort in the abdomen, which was tender to palpation, and which was aggravated by movement. Id. Elko concluded that this was likely secondary to a possible abdominal wall strain, as reported by the Plaintiff. Id. The Plaintiff wondered if the Entocort was playing a role in her muscle

and joint aches, and asked that it be discontinued.  Id.  Elko prescribed a taper of the Entocort and Tylenol, as needed for abdominal pain, and encouraged the Plaintiff to continue with her psychologist and her drug therapy.  Id.  Elko reported that she discussed at length with the Plaintiff, that improvement in psychosocial stressors might result in an improvement of her physical symptoms.  Id.    Dr. Hjemboe saw the Plaintiff again on June 5, 2007, for therapy related to the Plaintiff's stress and PTSD issues.  [T. 363].  At that time, the Plaintiff reported memory problems and a decrease in energy, which would hit her suddenly.  Id.   On June 26, 2006, the Plaintiff was seen at AVMC with complaints of a sore left leg from a bug bite.  [T. 324].  A few weeks later, on July 16, 2007, the Plaintiff was seen at AVMC again, with complaints that she had been experiencing leg and arm aches, and fatigue, for many months without improvement.  Id. Diagnoses of colitis, bursitis of the left shoulder, and fatigue, were noted in the medical records.  Id.

On July 26, 2007, the Plaintiff was seen by Dr. Hansen for a followup visit regarding her collagenous colitis.  [T. 331].  Recent laboratory tests of her liver, hemoglobin, and thyroid function, were normal.  Id.  The Plaintiff was in no acute distress, with a normal mental status and normal gait.  Id.  Dr. Hansen observed that the Plaintiff's significant psychosocial stresses appeared to be well-controlled.  Id.

He noted that the only thing that had controlled her colitis was Entocort, and that she had tried Asacol and sulfasalazine, which caused her to have systemic side-effects of headaches and weakness.[11] Id. He noted that she had also taken Questran, which had decreased her bowel movements, but it was stopped for a reason that was not apparent. Id. He prescribed Questran, advised that they would taper the Entocort if her stools decreased in frequency, and directed the Plaintiff to contact his office in two (2) to three (3) weeks. Id.

The Plaintiff was seen at AVMC on August 6, 2007, at which time, she received flu test results. [T. 323]. Diagnoses of microscopic colitis and fatigue were noted. Id. Chantix was discussed with the Plaintiff at that time, but her insurance would not cover a prescription for the medication.[12] Id. Two (2) days later, on August 8, 2007, the Plaintiff contacted AVMC again. Id. Apparently, Dr. English had recently prescribed Amitriptyline for the Plaintiff's pain, and she reported it was not working,

_____

[11]Sulfasalazine is "an antibacterial sulfonamide used orally or rectally in the prophylaxis and treatment of inflammatory bowel disease, and orally as disease-modifying antirheumatic drug in the treatment of rheumatoid arthritis." Dorland's Illustrated Medial Dictionary, at 1828 (31st Ed. 2007).

[12]Chantix "is indicated as an aid to smoking cessation treatment." Physicians Desk Reference, at 2713 (64th Ed. 2010).

and that she was experiencing a racing heart, migraines, vomiting, and a possible allergic reaction.[13]  Id.

The Plaintiff had another session with Dr. Hjemboe on August 15, 2007, at which time, the Plaintiff reported numerous physical symptoms.  [T. 362].  Dr. Hjemboe concluded that the Plaintiff had "resolved her recent stress reaction."  Id. The Plaintiff advised that she was looking for another doctor, because she was not confident in the expertise, or the advice, that she was receiving, explaining that a nurse had recently told her that she was on the wrong medication.  Id.  The Plaintiff believed that her physical symptoms were related to fibromyalgia.[14]  Id.  Dr. Hjemboe observed that the Plaintiff's symptoms began at the time of the traumatic incident with her sister, and that the Plaintiff was presently very concerned with her medical care and the chronicity and intensity of her symptoms.  Id.  She left the appointment complaining of a severe headache.  Id.

---

[13]Amitriptyline is a "tricyclic antidepressant of the dibenzocycloheptadiene group, also having sedative effects[.]"  Dorland's Illustrated Medical Dictionary, at 64 (31st Ed. 2007).

[14]Fibromyalgia is a condition characterized by "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points."  Dorland's Illustrated Medical Dictionary, at 711 (31st Ed. 2007).

On September 12, 2007, the Plaintiff presented to a counseling session with a significant increase in anxiety. [T. 525]. Dr. Hjemboe opined that the Plaintiff's symptoms of PTSD had returned. Id. Dr. Hjemboe further concluded that the Plaintiff probably had some somatizing tendencies, although she seemed to process "her emotions very effectually on a conscious level." Id. Shortly thereafter, on September 20, 2007, the Plaintiff was treated at the Millner Family Chiropractic Clinic, where she received x-rays, which indicated spinal deterioration. [T. 426].

On December 12, 2007, the Plaintiff saw Dr. Orandi at AVMC, at which time, she reported pain in all of her muscles and joints, migraine headaches, and muscle spasms. [T. 442]. The Plaintiff reported that the carisoprodol was helping with the muscle spasms, but her main concern was getting her pain under control.[15] Id. Diagnoses of colitis and fibromyalgia were noted, and Dr. Orandi referred the Plaintiff to a fibromyalgia clinic. Id. Multiple trigger points were observed in a physical

---

[15]Carisprodol is "a centrally acting skeletal muscle relaxant, for the symptomatic management of acute, painful muskuloskeletal disorders, administered orally." Dorland's Illustrated Medical Dictionary, at 301 (31st Ed. 2007).

exam.  Id.  Dr. Orandi prescribed a trial of Ultram, and advised the Plaintiff to continue taking Soma.[16]  Id.

Dr. Hjemboe saw the Plaintiff on December 31, 2007, at which time, he noted that the Plaintiff was sleep-deprived, and expressed some concern that she may have a sleep disorder.  [T. 524].  He recommended that she see another doctor, in order to address the sleep issues that she was having.  Id.  He noted that the Plaintiff's fears were growing, and that her fatigue seemed to be fueling them.  Id.  The Plaintiff reported that she fears going out in public, and not being able to get home, and that she fears driving, as a result of the fatigue she experiences.  Id.

The Plaintiff was seen by Dr. Kenneth Britton on January 18, 2008, on a referral from Drs. Orandi and English, for treatment of pain for a presumptive diagnosis of fibromyalgia.  [T. 568].  He noted the Plaintiff's past medical history of generalized myofascial pain, bowel complaints, restless legs, headaches, childhood physical abuse, and a "dramatic worsening in her chronic myofascial pain complaints

---

[16]Ultram "is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time." Physicians' Desk Reference, at 2694 (64th Ed. 2010). Soma is a "trademark for combination preparations of carisoprodol and aspirin." Dorland's Illustrated Medical Dictionary, at 1759 (31st Ed. 2007).

and other symptoms over the past year and a half."[17]  Id.  Dr. Britton conducted a physical examination of the Plaintiff, which was "essentially within normal limits with the exception of very significant generalized myofascial pain."  Id.  He found significant allodynia in essentially all regions, with no discrete focal orthopedic or neurological abnormalities.[18]  Id.  Dr. Britton indicated that he also reviewed a number of her medical records that were sent to him.  Id.

Following his review of her medical records and physical examination, Dr. Britton concluded that it was his impression that the Plaintiff did in fact have fibromyalgia syndrome.  Id.  He conducted a full work-up in order to exclude other possible causes of her symptoms, all of which were negative.  Id.  He prescribed Lyrica and referred the Plaintiff to their comprehensive chronic pain program for fibromyalgia, for treatment and physical therapy.[19]  Id.

---

[17]Myofascial pain syndrome is "caused by tension, fatigue, or spasm in the masticatory muscles."  See, The Merck Manual at 865 (18th Ed. 2006).  Allodynia is "pain resulting from a non-noxious stimulus to the skin."  Dorland's Illustrated Medical Dictionary, at 52 (31st Ed. 2007).

[18]Allodynia is "pain resulting from a non-noxious stimulus to normal skin." Dorland's Illustrated Medical Dictionary, at 52 (31st Ed. 2007).

[19]Lyrica is indicated for the treatment of fibromyalgia.  Physicians' Desk Reference, at 2731. (64th Ed. 2010).

The Plaintiff saw Dr. Wilbrand-Conley on February 18, 2008, for an annual examination. [T. 451]. Dr. Wilbrand-Conley opined that the Plaintiff was "plagued with fibromyalgia, [and] collagenous microscopic colitis." Id. She noted that the Plaintiff was experiencing excessive fatigue, muscle pain, pain in her neck, pain in the lower abdomen, diarrhea, hot flashes, and depression, and that she was taking Premarin, Lyrica, and Lexapro. Id. The examination revealed no gynecological abnormalities. Id.

On February 20, 2008, the Plaintiff saw Dr. Britton, at which time, he reported that the Plaintiff was experiencing myofascial pain, and that she appeared to be in no distress. [T. 567]. Following the examination, Dr. Britton prescribed continued physical therapy. Id. About one (1) week later, on February 27, 2008, the Plaintiff was seen by Dr. Hansen, at which time, he noted that he had been seeing her regularly since her diagnosis in October of 2006, and that the Plaintiff had been refractory to all medical therapy. [T. 455]. The Plaintiff reported that she had recently been diagnosed with fibromyalgia, and that she was experiencing eight (8) to ten (10) bowel movements a day. Id. Dr. Hanson noted that the Plaintiff was in no acute distress, with a normal mental status and gait, and a review of the Plaintiff's systems was "[r]emarkable mostly for fatigue, depression and anxiety," with all other systems

normal.  Id.  He noted that her current medications were vitamins, Ensure, Premarin, and Lexapro.  Id.

Dr. Hanson noted that the Plaintiff had used Pepto Bismol intermittently without benefit, and that she was unable to tolerate the use of Asacol, sulfasalazine, Questran, or Entocort.  Id.  Dr. Hansen concluded that he suspected the Plaintiff had symptoms of collagenous colitis, which were combining with the effects of clinically severe depression and anxiety, and he recommended that she pursue treatment of the depression and anxiety more aggressively.  Id.  He further recommended that the Plaintiff use Pepto Bismol chewable tablets, and Imodium, as needed.  [T. 456].

On March 14, 2008, the Plaintiff presented at AMVC with complaints of depression; racing heart; pain in the muscles of her right shoulder, armpit, and chest; and an increase in stress related to a death in her family.  [T. 499].  A physician noted diagnoses of depression, anxiety, and fibromyalgia, and prescribed Wellbutrin, Soma, Lexapro, and physical therapy.[20]  Id.

---

[20]Wellbutrin is a "trademark for a preparation of bupropion hydrochloride," which is a "a monocyclic compound structurally similar to amphetamine, used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal[.]"  Dorland's Illustrated Medical Dictionary, at p. 265, 2107 (31st Ed. 2007).

Mark Winkler, PA-C ("Winkler"), saw the Plaintiff on March 21, 2008, at which time, the Plaintiff presented with nausea, vomiting, myofascial pain, inability to focus, and blurred vision. [T. 566]. Winkler prescribed Neurontin and noted that the Plaintiff should see an eye doctor for the blurred vision, which was likely a side-effect from her medication.[21] Id.

Dr. Britton saw the Plaintiff on April 18, 2008, at which time, the Plaintiff reported that she was not tolerating Neurontin well. [T. 565]. He opined that the medications were not making a valuable difference in treatment, and that, most recently, the Plaintiff had been unable to tolerate Neurontin. Id. At this time, the Plaintiff told Dr. Britton that she had seen a television report on nephrogenic systemic fibrosis, and she was convinced that she had the condition, because she was experiencing blisters and pustules on her skin. Id. Dr. Britton noted that the medical records from AVMC showed normal renal function, and he concluded that it did not appear to be a correct diagnosis. Id. Dr. Britton discontinued the Plaintiff's prescription for Neurontin. Id.

---

[21]Neurontin is a trademark for preparations of gabapentin, which is "an anticonvulsant * * * used as adjunctive therapy in the treatment of partial seizures[.]" Dorland's Illustrated Medical Dictionary, at 764, 1287 (31st Ed. 2007).

On May 22, 2008, the Plaintiff saw Dr. Peter M. Parten following a referral from Dr. Britton, in relation to the Plaintiff's complaints of left shoulder pain, which had persisted for the last fifteen (15) years, with worsening over the last two (2) years. [T. 489]. The Plaintiff rated her pain as a seven (7) on a scale of ten (10), and she characterized the pain as stabbing, aching, and intermittent. Id. Following x-rays, Dr. Parten diagnosed the Plaintiff with left shoulder impingement syndrome, and scapular winging.[22] Id. He recommended physical therapy for the left shoulder and administered a subacromial injection of Lidocaine and Depo-Medrol.[23] Id.

On May 30, 2008, the Plaintiff was seen at AVMC, at which time, the Plaintiff requested a prescription for pain care. [T. 497]. Diagnoses of anxiety, depression,

---

[22]Impingement syndrome is "the progressive pathologic changes resulting from mechanical impingement by the acromion, coracoacromial ligament, coracoid process, or acromioclavicular joint against the rotator cuff; changes may include reversible edema and hemorrhage, fibrosis, tendinitis, pain, bone spur formation, and tendon rupture." Dorland's Illustrated Medical Dictionary, at 1859 (31st Ed. 2007). Winging of the scapula, or shoulder blade, exists where the scapula has "a prominent vertebral border." Id. at 1698.

[23]Lidocaine is "a drug having anesthetic, sedative, analgesic, anticonvulsant, and cardiac depressant activities[.]" Dorland's Illustrated Medical Dictionary, at 1048 (31st Ed. 2007). Depo-Medrol is a trademark for preparations of methylprednisolone acetate, which is "a synthetic glucocorticoid derived from progesterone, used in replacement therapy for adrenocortical insufficiency and as an antiinflammatory and immunosuppressant in a wide variety of disorders[.]" Id. at 499, 1171.

fibromyalgia, and chronic pain, were noted, and Effexor and Skelaxin were prescribed.[24]  Id.

On June 2, 2008, Dr. Hjemboe saw the Plaintiff, at which time, he noted that the Plaintiff was now treating for fibromyalgia, and still experiencing pain and fatigue. [T. 523].  The Plaintiff reported that she had discovered skull and nerve damages, which she attributed to childhood abuse.  Id.  The Plaintiff reported feeling scared while driving by herself.  Id.  The Plaintiff further reported that Dr. Hanson believed her physical ailments were psychological in origin, and that she should pursue more aggressive treatment for the depression.  Id.

On June 13, 2008, the Plaintiff was seen by Martha Hultgren, PT, at which time, the Plaintiff presented with shoulder pain and upper extremity weakness.  [T. 560-563].  She noted that the Plaintiff had been referred by Dr. Parten, for therapy related to impingement syndrome, and the scapular winging of her shoulder.  [T. 563].  The Plaintiff described the pain as sharp and achy, with stiffness, and she reported symptoms while pulling, pushing, lifting, reaching behind her back, and sleeping.  Id.

---

[24]Skelaxin is a trademark for a preparation of metaxalone, which is "a centrally acting skeletal muscle relaxant used in the treatment of painful musculoskeletal conditions[.]"  Dorland's Illustrated Medical Dictionary, at pp. 1163, 1748 (31st Ed. 2007).  Effexor is a trademark for preparations of venlafaxine hydrochloride, which is "used as an antidepressant and antianxiety agent."  Id. at 602, 2074.

Hultgren noted a past medical history of fibromyalgia, shoulder dislocation, migraines, bone spurs, joint pain, hip problems, and microscopic colitis. Id.

2. Assessments. In addition to the foregoing medical records, a number of assessments are contained in the Administrative Record. On June 21, 2007, Dr. Carl M. Leigh, who is a State Agency Physician, completed an assessment of the Plaintiff's physical residual functional capacity ("RFC").[25] [T. 338-345]. He noted that the Plaintiff alleged a disability as of March 6, 2007, due to diarrhea, pain, cramping, fatigue, malaise, and weakness, associated with collagenous colitis. [T. 339]. Dr. Leigh observed that the Plaintiff reported considerable variability, with respect to her functional capacity, between her good and bad days. [T. 343].

However, in spite of this variability, Dr. Leigh concluded that the Plaintiff's daily living activities were fairly extensive, which included getting the children off to school, cooking simple meals, doing dishes, doing laundry, and doing light housework. Id. Dr. Leigh also advised that the Plaintiff's allegations appeared to be "seriously out of proportion to the objective findings." Id. For example, Dr. Leigh noted that the Plaintiff alleged that she cannot take her children to the park, which is

---

[25]RFC is defined as the most an individual can still do after considering the effects of physical or mental limitations that affect that individual's ability to perform work-related tasks. 20 C.F.R. §404.1545.

three (3) blocks away, because she fears she will not be strong enough to make it back.  Id.  However, Dr. Leigh advised, that if the Plaintiff's symptoms of pain, weakness, and fatigue, were that debilitating, he would expect the Plaintiff to seek changes in medication, or other treatment modalities.  Id.

Overall, Dr. Leigh concluded that the Plaintiff's allegations of symptoms, and functional limitations, were found to be only partially credible.  Id.  Dr. Leigh concluded that the Plaintiff would be limited to lifting or carrying 20 pounds occasionally; lifting or carrying 10 pounds frequently; standing or walking for 6 hours in an eight (8) hour workday; and sitting for about six (6) hours in an eight (8) hour workday; and that she would be able to do unlimited pushing and pulling.  [T. 339]. He further concluded that the Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  [T. 340-342].

On October 3, 2007, the Plaintiff was examined by Dr. Alford Karayusuf in relation to her claim for Social Security Disability benefits.  [T. 380-382].  At the time of the examination, the Plaintiff was fifty-one (51) years old, and one hundred thirty-five pounds.  [T. 380].  He noted that her chief complaints were fatigue, diarrhea, which occurred approximately ten (10) times per day, and pain.  [T. 380].  The Plaintiff stated that she has no control over the fatigue, which hits her like a brick

wall, and that it hurts to sit and to stand.  Id.  She reported that there are times when she does not have strength to keep standing or holding her head up.  Id.

Dr. Karayusuf found the Plaintiff to be "a very somatically preoccupied woman."  Id.  The Plaintiff cried profusely numerous times during her interview, although he had some difficulty establishing whether or not the Plaintiff was being treated for depression.  [T. 380].  She would not indicate that she was depressed, and continued to emphasize that her problems were physical, although she acknowledged feelings of sadness.  Id.  Dr. Karayusuf related that the Plaintiff had been previously involved in counseling that was related to sexual and physical abuse, and that was committed by her father during her childhood.  Id.

The Plaintiff reported difficulty sleeping due to her headaches, diarrhea, and neck pain, but she had no changes in her appetite.  [T. 381].  Dr. Karayusuf observed that the Plaintiff's concentration and memory were diminished, she was distracted and unfocused, she constantly worried, her thoughts were always racing, and she was extremely apprehensive about the recent release of her sister from the St. Peter State Hospital, because she believed that her sister's mental health had not improved, and that her sister would try to kill her again.  Id.  Dr. Karayusuf stated that the Plaintiff

was oriented to time, place and person; that her memory was intact; that she had average intelligence; and that she had minimal insight. [T. 382].

Dr. Karayusuf recounted that the Plaintiff lived with her husband, and two (2) children, and that she had four (4) grown children, who did not live at home. Id. With respect to her daily living, Dr. Karayusuf reported that the Plaintiff would generally get up at 6:00 o'clock a.m., and go to bed at 8:00 o'clock p.m., that she bathed every two (2) to three (3) days, made her bed every day, and cooked for herself. [T. 381]. The Plaintiff advised that she did not do her own grocery shopping. Id. Dr. Karayusuf also noted that the Plaintiff drove when she needed to get around, and that she was capable of finding her way around. Id. The Plaintiff stated that she engaged in light housework, including dusting, sweeping, cleaning, and doing the dishes and laundry. Id. The Plaintiff would not say how often she engaged in those activities. Id. Dr. Karayusuf further stated as follows: "[The Plaintiff], for reasons that are not clear to me at all, would not answer questions about the frequency of dusting, vacuuming, laundry and washing dishes," but "[s]he would only say, 'I have to push myself to do these things.'" Id. The Plaintiff reported that she was able to concentrate on television programs, and that she watched about two (2) hours of television per day. Id.

Following his examination, Dr. Karayusuf diagnosed the Plaintiff with major depression, which he characterized as recurrent, with cyclothymic and possibly even bipolar features. [T. 382]. He also concluded that the Plaintiff exhibited elements of PTSD, which had cleared up over the years. Id. He went on to provide the following assessment of the Plaintiff's work-related abilities:

> She is able to understand, retain and follow instructions. She is not able to interact with the public due to her emotional lability and pressured speech. She is restricted to brief, superficial interactions with fellow workers and supervisors. Within these parameters and in the context of performing simple, routine, repetitive, concrete, tangible tasks, she is able to maintain pace and persistence.
>
> She is able to manage benefits.

Id.

On October 26, 2007, Thomas L. Kuhlman, Ph.D., L.P., who is a State Agency medical consultant, completed a Psychiatric Review Technique Form, and a Mental RFC Assessment. [T. 386-403]. First, Dr. Kuhlman found that the Plaintiff had an affective disorder -- namely, a depressive syndrome, which was characterized by a pervasive loss of interest in almost all activities, appetitive disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty with concentration or thinking. [T. 389]. He also found the Plaintiff to suffer from an anxiety-related disorder, which was evidenced by

a recurrent and intrusive recollection of a traumatic experience, that was a source of marked distress for the Plaintiff. [T. 391]. Lastly, Dr. Kuhlman believed the Plaintiff suffered from a somatoform disorder, which was evidenced by an "[u]nrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury." [T. 392].

Dr. Kuhlman advised that those mental disorders would result in a moderate limitation on daily living activities, a mild limitation in maintaining social functioning, moderate difficulty in maintaining concentration, persistence and pace, and with no episodes of decompensation. [T. 396]. Dr. Kuhlman went on to note that, while the Plaintiff was alleging only physical impairments, she minimized her mental impairments. [T. 398]. He further noted that she acted as a parent and homemaker, except when her physical symptoms impaired her, she was independent in hygiene and self-care, and she managed her finances adequately. Id.

In completing his RFC assessment, after considering all the evidence in the case record, Dr. Kuhlman noted his assessment was predicated on the conclusion "that the statements of [the Plaintiff] regarding alleged symptoms and their effect on functions are deemed only partially credible." [T. 402]. Dr. Kuhlman concluded that the Plaintiff had sufficient mental capacity to concentrate on, to understand, and to

remember routine, repetitive, and three (3) to four (4) step uncomplicated instructions, but that she would be markedly impaired for detailed or complex, technical instructions. Id. He also concluded that the Plaintiff's ability to carry out routine, repetitive, and three (3) to four (4) step tasks, with adequate persistence and pace, would not be significantly limited, but that it would be markedly limited for detailed or complex, technical tasks. Id.

Dr. Kuhlman further advised that the Plaintiff's ability to handle co-worker, and public contact, was reduced, but she would be able to handle brief, superficial contact, and that the Plaintiff's ability to tolerate and appropriately respond to supervision would be reduced, but adequate to handle ordinary levels of supervision, as found in customary work settings. Id. Lastly, Dr. Kuhlman concluded that the Plaintiff's ability to handle stress and pressure in the workplace was reduced, but he concluded that it would be adequate to handle the stress of routine, repetitive steps, or a three (3) to four (4) step work setting, and that she would not be able to handle the stresses associated with a detailed or complex work setting. Id. Dr. Kuhlman noted that his mental RFC assessment was consistent with Dr. Karayusuf's evaluation. Id.

On October 29, 2007, Dr. Gregory H. Salmi, who is a State Agency physician, concluded that, after reviewing Dr. Leigh's assessment of June 21, 2007, and all of the

medical records in the file, following the Plaintiff's request for Reconsideration, he found that there were no new allegations, and that the medical records revealed no worsening of symptoms. [T. 405-407]. Accordingly, Dr. Salmi affirmed the assessment of June 21, 2007, as written. [T. 406].

On June 5, 2008, Dr. Stolpman, who is one of the Plaintiff's treating physicians, completed a physical and mental medical assessment of the Plaintiff's ability to do work-related activity. [T. 500-508]. With respect to the physical assessment, Dr. Stolpman noted that it was his opinion that the Plaintiff would be limited in her work-related activities by her fatigue, migraine headaches, depression, weakness, joint pain and fibromyalgia, based upon his review of her medical history and examinations. [T. 504]. He concluded that the Plaintiff would be limited to carrying ten (10) to fifteen (15) pounds occasionally, and five (5) pounds frequently; standing or walking for one (1) hour in an eight (8) hour workday, and less than one (1) hour without interruption; sitting for four (4) to six (6) hours in an eight (8)-hour workday, and less than one (1) hour without interruption. [T. 501-503]. He further concluded that the Plaintiff could never climb or crawl, and that she could only occasionally balance, stoop, crouch, kneel, reach, push, or pull. [T. 502-503]. He found that the Plaintiff would have environmental restrictions, due to her allergies and fibromyalgia, and would have to

avoid moving machinery, temperature extremes, chemicals, dust, noise, fumes, and humidity.  [T. 503].

With respect to his mental assessment, Dr. Stolpman noted that the Plaintiff's symptoms included poor concentration and memory, depression, fatigue, and a limited capability of dealing with stress.  [T. 506-507].  In particular, Dr. Stolpman concluded that the Plaintiff would experience extreme limitations in dealing with work stress; marked limitations in maintaining attention and concentration; marked limitations in understanding and carrying out complex job instructions; and a marked limitation in demonstrating reliability.  [T. 506-507].  He further concluded that the Plaintiff would experience moderate limitations in following work rules; using judgment; functioning independently; in her ability to understand and carry out detailed but not complex job instructions; and in her ability to behave in an emotionally stable manner.  [T. 506-506].  Dr. Stolpman noted that his own treatment, which had only lasted about four (4) months, had been insufficient to form a basis for his assessments, and he based his opinion on the medical records that were available.  [T. 508].

On June 16, 2008, Dr. Hjemboe completed a medical assessment of the Plaintiff's mental ability to do work-related activity, in relation to her disability claim.  [T. 542-544].  Dr. Hjemboe noted a medical history of depression, anxiety, PTSD, and

a vulnerability to stress. [T. 542]. He opined that stress and energy are chronic problems for the Plaintiff, which is influenced by chronic physical ailments. Id. He found that the Plaintiff would have marked difficulty in dealing with work-related stress, and that she would experience a moderate limitation in her ability to maintain concentration and attention, in understanding and carrying out complex job instructions, and behaving in an emotionally stable manner. [T. 542-543].

3. Other Records. On April 13, 2007, the Plaintiff completed a Function Report, in which she described how her impairments limited her daily living activities, which may be summarized as follows. [T. 151-162].

The Plaintiff reported muscle and joint pain, headaches, and dizziness, and other aches and pains all over her body, which affected her ability to sleep. [T. 152]. The Plaintiff related that she cared for her two (2) youngest children, who were ages six (6) and nine (9), and that she cared for two (2) dogs, by letting them outside and feeding them. Id. She did not need reminders to take care of personal needs and grooming, and she has no problems with her personal care, although it takes her a lot longer than it used to, to complete those tasks. Id. The Plaintiff reported that her husband and children had to remind her to take medications, and she had to get a pill box in order to keep track of the medications that she was taking. [T. 153].

The Plaintiff advised that she is able to drive a car, although, if she felt too sick or dizzy, she would not drive, but that her children were able to take the bus to school on those days. [T. 154]. She advised that she went shopping about once a week, although it was becoming less frequent. Id. When she was not feeling dizzy or having a headache, she would pays bills and handle a savings account. Id. She further reported that her ability to handle money had declined since her condition began. [T. 155].

The Plaintiff stated that she would generally get up at 6:00 o'clock a.m. every day, at which time, she would try to get a few things done before awakening her two (2) children. [T. 151]. The Plaintiff advised that, on those mornings that she felt well enough, she might do a load of laundry before getting her children's clothing ready for the day. Id. After the Plaintiff got her children up in the morning, she made them breakfast, made sure they got ready for school, and then brought them to school. Id. If she had a good day, the Plaintiff would get groceries, or do other shopping. Id. On bad days, she would just stay home and rest. [T. 159].

According to the Plaintiff, she prepared only simple meals for her family. [T. 153, 161]. The Plaintiff reported that she would take out the trash, do light cleaning,

and do the laundry and dishes. [T. 153]. However, she noted that she had hired someone to help with the cleaning. Id.

With respect to hobbies, the Plaintiff reported that she loved to spend time with her children but, since her illness, she was no longer able to play with her children, and just watched instead. [T. 155]. The Plaintiff further stated that she could not walk to the park with her children, which is only three (3) blocks away, because she was afraid that she would not have enough strength to make it back home. [T. 160]. The Plaintiff stated that she rarely goes anywhere with friends or family anymore. [T. 156].

With respect to work-related abilities, the Plaintiff reported that she was able to follow instructions very well, that she followed spoken instructions "pretty good," and that she got along very well with authority figures. [T. 156-157]. However, she advised that she had a hard time dealing with stress since the onset of her illness. [T. 157]. She reported that one (1) of the reasons she quit working was because she would become overwhelmed with completing tasks. [T. 161]. The Plaintiff further reported that she often loses track of what she is doing, and that it takes her a long time to complete tasks because she has a hard time concentrating. Id. In addition, the Plaintiff asserted that her condition affected her ability to lift, stand, walk, hear, climb

stairs, and see.  [T. 156].  She further reported symptoms related to her  memory and her ability to complete tasks and to concentrate.  Id.

On August 7, 2007, the Plaintiff submitted a communication, in which she advised that her symptoms were becoming worse, and that she had recently been diagnosed with fibromyalgia.  [T. 184-199].  She further advised that she was no longer able to complete simple tasks, and that she needed help with cleaning, laundry, groceries, lawn work, and caring for her children.  [T. 193].  She reported that she was afraid to leave her home, because of the diarrhea and fatigue.  [T. 194].  She noted that she was afraid that if she left, she would not be able to make it home.  Id.  She further noted that she had missed appointments because she was too weak to drive.  Id.  She reported that she was waking up several times each night with pains in her legs, arms, back, head, and stomach.  Id.

On August 16, 2007, the Plaintiff's husband filled out a Function Report Form. [T. 200-212].  Her husband reported that, on some days, while he was at work, she was able to get dishes and housework done, but on other days all she could do was rest.  [T. 200].  He also stated that the Plaintiff wakes up several times a night with pain and headaches.  [T. 201].  He reported that the Plaintiff cared for their children, cared for their dogs, and prepared daily meals, but that she received a lot of help from

her mother, and from her grown children. [T. 201-202]. He further indicated that the Plaintiff was able to do laundry and dishes on some days, depending on her energy level, but on other days, she would do no household chores, and that, as a result, they had someone to help with the cleaning. [T. 202]. According to the Plaintiff's husband, she was able to drive, depending on her symptoms. [T. 203]. He noted that the Plaintiff's mother had been at their house three (3) times that week, in order to help complete chores around the house, such as picking up groceries, washing dishes, cleaning, and getting food ready for the children. [T. 207].

The Record also contains the Plaintiff's application for a disability parking certificate, dated May 30, 2008, in which Dr. Stolpman reported that the Plaintiff's ability to walk was severely limited by fibromyalgia and weakness. [T. 495].

4. <u>Evidence Presented to the Appeals Council</u>.

As we have noted, following the ALJ's decision, the Plaintiff requested review by the Appeals Council and, at that time, she submitted additional evidence. [T. 1]. In denying the Plaintiff's request for review, the Appeals Council advised that it had considered the additional evidence submitted by the Plaintiff, but that it had concluded that the evidence was not material to the ALJ's decision. [T. 2]. In particular, the Appeals Council concluded, as follows:

> The contentions do not raise any new issue of law or fact. Essentially, the contentions are directed toward the Administrative Law Judge's evaluation of the evidence and testimony and consequently, the ultimate issue of "disability." The Appeals Council finds that the Administrative Law Judge fully considered and evaluated the evidence and reached the appropriate conclusions on the issues.

Id.

Among the documents that the Appeals Council received were receipts for food deliveries, which were dated July 18, 2008. [T. 4, 252-256]. The Plaintiff also submitted a list of her treating physicians, and an informational sheet on fibromyalgia. [T. 250, 262].

In addition, the Plaintiff submitted a physical therapy plan, which is dated February 20, 2008, and which was developed by Mathew Vraa ("Vraa"), who is a Physical Therapist. [T. 569]. On that day, the Plaintiff presented with headaches, abdominal pain, and upper thoracic and low back pain. Id. Vraa noted some visual restrictions, and recommended that she see an ophthalmologist, in light of significant status changes in the last several weeks. Id. In addition, the Plaintiff submitted physical therapy exercise instructions; records indicating that the Plaintiff was scheduled to have an MRI Scan of her left shoulder, at the direction of Dr. Parten on August 8, 2008; and a form indicating that Dr. Parten recommended physical therapy,

on May 22, 2008, following the Plaintiff's diagnosis for left shoulder impingement syndrome and scapular winging. [T. 570-574].

The Plaintiff also submitted a letter from Dr. Scott Millner, who is a Chiropractor. The letter is dated August 19, 2008, and contains Dr. Millner's report that he first saw the Plaintiff on September 19, 2007, for chronic discomfort, and that x-rays taken at that time revealed a reversed cervical curve, and moderate to severe degeneration of her cervical spine. [T. 575]. He noted that the Plaintiff's symptoms were neck pain, shoulder pain, upper back pain, and overall muscle soreness. Id. Dr. Millner advised that he had performed a Bio-Impedence Analysis of the Plaintiff which, he advised, was a test to help measure cell health, hydration, metabolism potential, body composition, and BMI. [T. 575-579]. The tests showed signs of low metabolism and increased cell breakdown, which were being treated with improved nutrition, and decreased stress levels. [T. 575].

5.      Evidence Submitted to the Court.

At the time that the Plaintiff filed her Complaint, she also filed numerous documents with the Court. Some of the documents were already a part of the Administrative Record. However, those documents, which were not a part of Administrative Record, may be briefly summarized.

- 42 -

The Plaintiff was she was seen by Dr. Britton on August 18, 2008, for a follow-up examination that was related to the Plaintiff's diagnosis for fibromyalgia and chronic myofacial pain, at which time, he also conducted an assessment of her physical ability to do work-related activities. See, <u>Exhibit 1 to Complaint</u>, <u>Docket No. 1-1</u>, at p. 2 of 28. Dr. Britton noted that she had not tolerated medications, and that he did not have any further recommendations by way of additional treatment. <u>Id.</u> The Plaintiff was found to be positive at multiple trigger points. <u>Id.</u> at p. 1 of 28. Dr. Britton went on to conclude that the Plaintiff suffered from cervical disc degeneration, lumbar disc degeneration, fibromyalgia and chronic pain, and he recommended follow up visits as needed, and for any significant changes. <u>Id.</u> at p. 1 of 28.

On that same day, Dr. Britton also completed a Medical Assessment of the Plaintiff's physical ability to do work-related activities, in which he advised that the Plaintiff's impairments affected her ability to lift or carry items, to stand and walk, and to sit. <u>Id.</u> at pp. 3-6 of 28. Dr. Britton also expressed his opinion that the Plaintiff could carry ten (10) pounds occasionally and two (2) pounds frequently; that she could stand or walk for a total of four (4) hours, in an eight (8)-hour workday, and less than one (1) hour without interruption; and that she could sit for four (4) hours in an eight (8)-hour workday, and less than one (1) hour without interruption. <u>Id.</u> at pp. 3-4.

He further opined that, as a result of the Plaintiff's impairments, she could never climb, balance, stoop, crouch, kneel, or crawl.  Id. at p. 4 of 28.  He believed that the Plaintiff could occasionally reach, handle, feel, push and pull, and that she could constantly see, hear, and speak.  Id. at p. 5 of 28.  He also noted that the Plaintiff's impairment would require restrictions related to heights, heavy machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibrations.  Id. He concluded that the fatigue that the Plaintiff experienced would also limit her ability to work an eight (8)-hour work day, five (5) days per week.  Id. at p. 6 of 28.

Accordingly, Dr. Britton made the following assessment of the effects of the Plaintiff's impairments:

> Work restrictions I believe within a reasonable degree of medical certainty that she is unable to engage in any significant gainful activity due to the fibromyalgia, degenerative disk [sic] disease, and resultant chronic pain. I believe that she is permanently and totally disabled and that the prognosis for any significant change is very poor.

Id. at p. 1 of 28.

The Plaintiff also submitted an initial physical therapy evaluation, which was prepared on January 25, 2008, by Vraa on the referral of Dr. Britton.  Id. at p. 9 of 28.  Vraa advised that the Plaintiff had been having pain for appoximately two (2) to three (3) years, but he noted that a review of her history showed that she was having symptoms,

markers, and warnings signs, which were not picked up on, for chronic hyperirritiability and neural issues.  <u>Id.</u>  He further advised that it was his opinion that the Plaintiff had psychological issues that added an overlay to her pain issues.  <u>Id.</u> The Plaintiff underwent physical therapy and, following treatment, Vraa instructed the Plaintiff on a home exercise program.  <u>Id.</u>

The Plaintiff also submitted medical records reflecting that she had a physical therapy session with Vraa on May 16, 2008, at which time, the Plaintiff presented with pain in the shoulder, low back, and the left hip.  <u>Id.</u> at p. 19 of 28.  He noted that the range of motion in her left shoulder was good.  <u>Id.</u>  He also concluded that they should pursue treatment of the left shoulder more aggressively, and referred the Plaintiff to Dr. Peter Parten of Summit Orthopedics.  <u>Id.</u>

On September 4, 2008, the Plaintiff appeared for a physical therapy session with Vraa, at which time, she presented diagnostic imaging of her shoulder, from Summit Orthopedics.  <u>Id.</u> at p. 22 of 28.  Vraa noted that it had been approximately four (4) months since their last session.  <u>Id.</u>  The treatment did not include a home exercise treatment, but they discussed getting the Plaintiff back into a home walking program.  <u>Id.</u>

On October 23, 2008, the Plaintiff presented at a physical therapy session with chief complaints of increased pain and weakness in the legs, and lower back and neck, problems with concentration and completing tasks, mental issues, and facial pain.  Id. at p. 23 of 28.  A review of the Plaintiff's systems revealed neck stiffness, muscle spasms in the neck, and muscle aches in the neck and shoulder.  Id.  Vraa noted that the Plaintiff suffered from generalized pain, which was characterized by a pressure, burning, sharp cramping, and numbness qualities, that were present constantly.  Id. He further noted that she suffered from muscle aches; facial, neck, and limb pain; as well as symptoms in her hands, wrists, elbows, arms, shoulders, midback, lower back, hip, knee, ankle, and foot.  Id.  Vraa advised that the Plaintiff lacked a good compensation mechanism for dealing with stress, and exhibited general neural irritation which, he concluded, was possibly due to high anxiety or poor stress compensation.  Id.  Vraa further concluded that the Plaintiff's gastrointestinal symptoms were possibly due to nervous system issues, emotional issues, stress, and lack of sleep.  Id. at p. 24 of 28.

Vraa further noted that the Plaintiff would be seeing her general practitioner the next day, and stated that the Plaintiff would ask about getting additional testing.  Id. He advised that they would see about getting the Plaintiff back on a low dose of

Lyrica, since it had been beneficial in the past.  Id.  Vraa further noted that the Plaintiff has previously had three (3) bouts of shingles which, he opined, was likely due to her lack of ability to handle stress.  Id.

On October 24, 2008, the Plaintiff was seen by Winkler, at which time, the Plaintiff's chief complaint was chronic generalized pain.  Id. at p. 25 of 28.  Winkler noted diagnoses of fibromyalgia, psychiatric disorders, and chronic pain syndrome. Id. at p. 26 of 28.  A review of the Plaintiff's systems revealed that her systems were normal, although the Plaintiff was positive at multiple trigger points.  Id. Winkler prescribed Lyrica, and referred the Plaintiff to the Minnesota lung and sleep center. Id.

The Plaintiff was seen by Vraa for physical therapy again, on October 21, 2008, at which time, her chief complaint was IBS.  Id. at p. 27 of 28.  Following physical therapy, Vraa noted that they had discussed the "pain cycle."  Id. at p. 28 of 28.  He reported that the Plaintiff does not understand, and wants a quick fix for her health issues.  Id.  He opined that the Plaintiff needed to address her anxiety, stress, and coping, and that she should be seeing a psychologist, and a nutritionist.  Id.

The Court documents also contain a letter from Dr. Stolpman, which is dated October 24, 2008, in which he advised that the Plaintiff had been a patient at AVMC

for approximately ten (10) years, and that he recently started treating the Plaintiff following the retirement of Dr. English. See, Exhibit 2 to Amended Complaint, Docket No. 1-2, at p. 1 of 14. He advised that Dr. English had diagnosed the Plaintiff with fibromyalgia, in September of 2007, and that she was being treated with Soma, and Effexor for depression. Id. Dr. Stolpman noted that the Plaintiff was plagued with many medical issues, but that she was most notably being treated for chronic fatigue, fibromyalgia, and depression. Id. He further opined that he believed that the Plaintiff was unable to work outside the home due to her chronic fatigue and fibromyalgia. Id.

B.     Hearing Testimony. The Hearing, on June 18, 2008, commenced with the ALJ making some opening remarks and noting the appearances of the Plaintiff, the Plaintiff's Attorney, and Robert Brezinski, the Vocational Expert ("VE"). [T. 24]. The ALJ noticed that the Plaintiff was tilting her head during his remarks, and asked if she had a hearing problem. Id. The Plaintiff responded that she did, in both ears, which had been treated in the past. [T. 24-25].

Next, the ALJ asked the Plaintiff's attorney if she had a chance to review the Exhibits, and the Plaintiff's attorney acknowledged that she had looked at the exhibits. [T. 25]. The ALJ noted that Exhibit 22E reflected that the Plaintiff had held prior

positions as an accounting clerk, and a personnel recruiter, and he then asked the Plaintiff if that was correct, [T. 26], and she said that it was accurate. Id. The ALJ then asked the Plaintiff how long she had held those positions, and the Plaintiff stated that she held the accounting clerk position from 1974 until 2001, and that she held the personnel recruiter position for almost one (1) year. [T. 26-27]. The ALJ asked the VE if the personnel recruiter job was long enough for consideration, and the VE stated that he believed that it was long enough. [T. 28].

Next, the ALJ asked the Plaintiff's attorney if she had any objections to the exhibits, and she stated that she did not have any objections. Id. The ALJ then admitted Exhibits 1A through 40F into the Record. Id. The Plaintiff's attorney noted that she was still waiting on information from two (2) sources, and the ALJ responded that she should submit those records when she received them, and that he would consider them. Id.

The ALJ then asked the Plaintiff's attorney if she would like to make any opening remarks, which she did. Id. The Plaintiff's attorney noted that the Plaintiff has been diagnosed with collagenous colitis, fibromyalgia, anxiety and depression, chronic pain, and fatigue. [T. 28-29]. She noted that she had received an RFC from Dr. Stolpman, who concluded that the Plaintiff was limited in both her physical and

mental capacities, and that she had marked limitations in maintaining attention, concentration, and demonstrating reliability, and extreme difficulty in dealing with work stresses. [T. 29]. She further asserted that, based upon the Plaintiff's pain, her need to frequently change positions, and her frequent use of the restroom, the Plaintiff was unable to engage in any kind of full-time employment, including any of her past work. Id.

The ALJ then asked the Plaintiff if she was with Dr. Stolpman when he filled out the documents, and the Plaintiff stated that she was not. Id. The ALJ then asked the Plaintiff's attorney what was sent to Dr. Stolpman with the forms that he had filled out, and she responded that she sent a form letter. Id. The ALJ noted that he was surprised at the assessments Dr. Stolpman made, given the records up to that time. [T. 29-30]. The Plaintiff stated that Dr. Stolpman received his information from what she told him, and that she had been going to AVMC for years. [T. 30]. No other opening remarks were made, and the Plaintiff was sworn to testify. Id.

The ALJ began the questioning by asking the Plaintiff about her basic physical characteristics. Id. The Plaintiff responded that she was five (5) feet, one (1) inch tall, approximately one hundred twenty-five (125) pounds, and was right-handed. Id. The Plaintiff further testified that she lived with her husband and two (2) children, who

were ages seven (7) and ten (10).  Id.  The ALJ asked the Plaintiff what the source of income was for the family, and she stated that her husband provided the income to the family through his employment.  Id.

Next, the ALJ asked the Plaintiff what kept her from working.  Id.  The Plaintiff responded that the cumulative effects of her impairments kept her from working.  Id. The Plaintiff elaborated that she has been unable to take medication for the fibromyalgia, as a result of her immune disease and, similarly, she could not take medication for her immune disease, as a result of the fibromyalgia.  [T. 30-31].

The Plaintiff's attorney then asked about how her illnesses affected her past employment.  [T. 31].  The Plaintiff stated that the microscopic colitis causes her to experience diarrhea ten (10) times per day, which interrupted her work.  [T. 31-32]. The Plaintiff's attorney then asked the Plaintiff about the pain she experiences.  [T. 32].  The Plaintiff testified that she experiences pain from head to toe, in her muscles and joints, and stabbing pains in her colon and abdomen.  Id.  The Plaintiff's attorney then asked the Plaintiff what she was taking to relieve the pain, and the Plaintiff stated that she was taking Tylenol which, she acknowledged, helped with the pain.  Id.

Next, the Plaintiff's attorney asked about the Plaintiff's sleeping habits.  Id. The Plaintiff responded that she cannot sleep through the night, and that she usually only

sleeps about (3) hours, after taking a muscle relaxer, but then awakens with pain. Id. The Plaintiff's attorney then asked if the Plaintiff had to take naps during the daytime, and the Plaintiff stated that she would generally pass out as a result of severe fatigue, over which she has no control. [T. 32-33]. The Plaintiff's attorney also asked the Plaintiff if she was able to drive, and the Plaintiff stated that it depends upon whether she is experiencing fatigue, and that she does not drive when she is fatigued. [T. 33]. She added that it is painful to drive, but that she is able to drive short distances. Id.

The Plaintiff's attorney then asked her how often she experienced migraines, and the Plaintiff testified that she has migraine headaches every week, sometimes as often as two (2) or three (3) times in a week. Id. The Plaintiff added that her migraines can last anywhere from one (1) day to an entire week. Id. The Plaintiff's attorney asked what the Plaintiff did to relieve the headaches, and the Plaintiff stated that she was unable to take any medications to treat them, and they generally do not go away until she throws up. Id.

Next, the Plaintiff's attorney questioned about how the Plaintiff's pain affects her ability sit and stand. [T. 33-34]. The Plaintiff testified that she could sit still for approximately five (5) minutes, stand for five (5) to ten (10) minutes, and walk approximately one (1) block before taking a break. [T. 33-34]. The Plaintiff's

attorney then asked the Plaintiff about her ability to do household chores. [T. 34]. The Plaintiff stated that she sometimes will do household chores, such as washing the dishes or doing laundry, but sometimes she cannot because she is unable to get out of bed. Id. She added that she is unable to get out of bed approximately twice per week, although it is sometimes more often than that. Id.

The Plaintiff's attorney then questioned the Plaintiff about her memory. [T. 35]. The Plaintiff testified that she had difficulty with remembering things, and that she often lost or misplaced things around the house. Id. The Plaintiff added that she could balance a checkbook with assistance, and that she had difficulty following a storyline on television, and in reading books. Id.

Next, the Plaintiff's attorney asked her about how her health problems affected her family, and the Plaintiff testified that she was constantly missing family activities, and her children's school programs, as a result of her health. [T. 35-36]. The Plaintiff added that she could not even take her children to the park, because she could not walk that far. [T. 36].

The ALJ then asked the Plaintiff what she thought about the fact that some of the medical records suggested that she was imagining her physical problems. Id. The Plaintiff stated, in response, that the doctor who said that didn't know what she was

feeling, and that she did not know why anyone would say that.  Id.  The Plaintiff then asked the ALJ who had said that she was just imagining her physical problems, to which the ALJ said it was in the medical records.  [T. 36-37].  The Plaintiff then stated that she knew that it was Dr. English who indicated that it was all in her head.  [T. 37]. The ALJ then asked the Plaintiff why she thought it was Dr. English.  Id.  The Plaintiff said that Dr. English told her he thought she had fibromyalgia, and that he had said that she had a whole "laundry list of things," including restless legs.  Id.  The Plaintiff further added that he had erroneously stated that fibromyalgia only applied to the upper body, which was incorrect.  Id.  The ALJ then said that some of the medical records indicated that she has an "unrealistic interpretation of physical signs or sensations, associated with a preoccupation or belief that one has a serious disease or injury."  [T. 38].  In response, the Plaintiff stated that the x-rays did not lie, which showed that her neck "goes forwards instead of backwards."  Id. She also added that Dr. English did not know what he was talking about, and that is why she stopped seeing him.  Id.

The Plaintiff's attorney proceeded to ask the Plaintiff about the last job she had held as a personnel recruiter.  [T. 38].  The Plaintiff responded that she left the position because she was unable to keep up with the demands of the job, and that it

was a mutual agreement with her employer that she leave.  [T. 38-39].  The Plaintiff elaborated that she did not receive unemployment benefits following her separation from that job.  [T. 39].

The ALJ then swore the VE to testify. Id.  The ALJ asked the VE about his background, and then asked the Plaintiff's attorney if she had any objection to his testimony, which she did not.  [T. 39-40].  The ALJ inquired if the VE needed any additional information, or if he wanted to make any changes to the report that he had submitted, and the VE stated that he did not.  [T. 40].

The ALJ then posed a hypothetical to the VE, in which he asked the VE to assume a fifty-one year old woman, with two (2) years of post-secondary education, and with the Plaintiff's past relevant work experience.  Id.  The individual would be limited to lifting twenty (20) pounds occasionally and ten (10) pounds frequently; and standing and sitting for six (6) hours each, in an eight (8) hour work day; with no more than occasional stair climbing, balancing, stooping, kneeling, crouching, and crawling, and with no ladder climbing.  [T. 40-41].  The ALJ further limited the individual to simple, routine tasks, with vocational changes in a routine work setting, occasional interaction with coworkers and supervisors, and no interaction with the public.  [T. 41].

Next, the ALJ asked the VE what exertion level that would produce, and the VE responded that the result would be light, unskilled work.  Id.  The ALJ then asked the VE if the individual in the hypothetical could perform any of the Plaintiff's past relevant work, Id., and the VE testified that he did not believe that the hypothetical individual could perform the Plaintiff's past relevant work.  Id.  The ALJ then asked if, assuming an individual with the same age, education, and work experience as the Plaintiff, there were any jobs that could be performed with that profile.  Id.  The VE testified that, given that profile, the individual could perform the following jobs that were available in the State of Minnesota:  15,000 to 16,000 cleaner positions; 9,000 to 10,000 assembly jobs; and 5,000 to 6,000 machine-operator jobs.  Id.

The ALJ then asked the VE how his testimony would change if the individual was limited to lifting ten (10) pounds occasionally and five (5) pounds frequently; standing for two (2) hours in an eight (8) hour workday; and sitting for six (6) hours in an eight (8) hour workday.  [T. 42].  The VE responded that would result in a sedentary exertional level, and there would be no past work or transferable skills.  Id.

Next, the Plaintiff's attorney asked the VE whether the light, unskilled jobs that he identified, with respect to the first hypothetical, would permit a person to leave the work site for bathroom breaks up to ten (10) times per day.  Id.  The VE asked the

Plaintiff's attorney how long the breaks would be, and the Plaintiff's attorney replied that the breaks would last approximately ten (10) minutes.  Id.  The VE stated that he did not believe that would be allowed in a competitive job situation.  [T. 43].

The ALJ then asked the Plaintiff if there was anything that she wanted to add. Id.  In response, the Plaintiff stated that she had a written statement from her doctor, which confirmed that she had been diagnosed with microscopic colitis, and she asked how someone could conclude that it was just in her head.  Id.  The ALJ stated that he did not think anybody was saying it was just in her head.  Id.  The Plaintiff then stated that she had x-rays showing her back and side, and the ALJ replied that he believed that the x-rays were in the Record, and that he would consider them.  Id. The Plaintiff's attorney also stated that she believed the x-rays were in the Record, and further stated that she would check to make sure they were.  Id.  The Plaintiff then stated that she was aware that there were people who thought that fibromyalgia is just in a person's head, but she stated her belief that it was very real and that she would not wish the illness on anyone.  Id.  The ALJ concluded by noting that he would issue a written Decision. Id.

C.    The ALJ's Decision.  The ALJ issued his decision on July 19, 2008.  [T. 6-17].  As he was required to do, the ALJ applied the sequential, five-step analytical

process that is prescribed by 20 C.F.R. §§404.1520, and 416.920.[26]  The ALJ noted

that the Plaintiff was insured for DIB through September 30, 2008.  [T.11].  As a

threshold matter, the ALJ concluded that the Plaintiff had not engaged in substantial

gainful activity since the date of her alleged onset of disability.  Id.

Next, the ALJ examined whether the Plaintiff was subject to any severe

physical or mental impairments, which would substantially compromise her ability to

---

[26]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

engage in work activity.  Id.  After a consideration of the entire Record, which included the Plaintiff's medical records and history, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by an affective disorder, an anxiety disorder, a somatoform disorder, and collagenous colitis.  Id.  Additionally, the ALJ found that the Record showed that the Plaintiff had been diagnosed with fibromyalgia, left shoulder impingement, headaches, and that there was a subjective report of hearing loss.  Id.  The ALJ acknowledged that he would consider all of the Plaintiff's alleged symptoms, but that the impairments of fibromyalgia, left shoulder impingement, headaches, and hearing loss, had not resulted in functional limitations of a twelve (12) month duration, and therefore, he found them not to be severe.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P of the Regulations.[27]  See, 20 C.F.R. §§404.1520(d) and 416.920(d).  [T. 11-12].  He determined that the Plaintiff's impairments did not meet, or equal, the criteria of any Listed Impairment.  Id.

―――――――――

[27]Appendix 1 contains a Listing of Impairments that identifies a number of different medical conditions, and describes a required level of severity for each condition.  If the required severity is met, then the claimant is found disabled without considering vocational factors.

First, the ALJ found that the Plaintiff's severe impairment of collagenous colitis did not meet or equal the criteria of any Listed Impairment. [T. 11]. Next, the ALJ found that the Plaintiff's mental impairments -- namely, an affective disorder, an anxiety disorder, and a somatoform disorder -- "d[id] not meet or medically equal the criteria listings of 12.04, 12.06, 12.07." [T. 12]. In making that determination, the ALJ considered whether the Paragraph B criteria were satisfied, which requires that the mental impairment must result in at least two (2) instances of marked restriction in daily living activities; in maintaining social functioning; in maintaining concentration, persistence or pace; or, if the claimant had experienced repeated episodes of decompensation, with each being of an extended duration. Id.

In finding that the Plaintiff's mental impairments did not meet or medically equal the criteria of Listings, the ALJ concluded that the Plaintiff suffered moderate restriction in daily living activities. Id. The ALJ found that the Plaintiff was able to adequately care for herself, her children, and her household; maintained adequate personal hygiene; prepared simple meals; and was able to do the laundry, wash dishes, and grocery shop, although he acknowledged that the Plaintiff had some limitations secondary to her pain and fatigue. Id. The ALJ further concluded that the Plaintiff had mild difficulties with social functioning, and found that she related appropriately

to all examining and treating sources, that she was able to maintain stable interpersonal relationships, had no difficulty going unaccompanied, and had no fear of authority figures.  Id.

The ALJ further concluded that, with respect to concentration, persistence and pace, the Plaintiff had moderate difficulties.  Id.  He noted that psychological evaluations had confirmed that the Plaintiff was "fully oriented with a logical and goal directed thought process, average intelligence and normal concentration."  Id.  The ALJ also noted that the Plaintiff was able to wake her children in the morning, drive them to school, concentrate on television programs, and that she was able to handle finances, which included paying bills.  Id.

Lastly, the ALJ noted that the Plaintiff had not had any episodes of decompensation, no documented need for psychiatric hospitalizations, or crisis center interventions.  Id.  Accordingly, the ALJ concluded that, because the Plaintiff had not experienced at least two (2) marked limitations, or one marked limitation and repeated episodes of decompensation, the Paragraph B criteria had not been satisfied.  Id.  The ALJ noted that he had also considered the Paragraph C criteria, and had concluded that those criteria had also not been met.  Id.

Next, the ALJ determined the Plaintiff's RFC. [T. 13-15]. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of her symptoms. [T. 13]. The ALJ noted that the Plaintiff alleged that she could not work "due to pain, fatigue, chronic diarrhea, depression, and anxiety." Id. After considering the testimony at the Hearing, the opinions of the Plaintiff's treating physicians, the objective medical evidence, and the Plaintiff's subjective complaints, the ALJ found the Plaintiff's RFC to be as follows:

> [T]he claimant has the residual functional capacity to perform light work involving occasionally lifting up to twenty pounds; frequently lifting up to ten pounds; standing for six hours in an eight hour workday; sitting for six hours in an eight hour workday; never climbing ladders; occasional climbing stairs, balancing, stooping, kneeling, crouching, and crawling; simple, routine tasks (unskilled); occasional changes in a routine work setting; no interaction with the public; and only occasional interaction with coworkers or supervisors.

Id.

In reaching that RFC, the ALJ concluded that the Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. Id. However, the ALJ found that the Plaintiff's statements, as to the intensity, persistence, and limiting effects of her symptoms, were not entirely credible, to the extent that they were inconsistent with his RFC assessment. Id.

First, the ALJ noted that the objective medical findings, and the Plaintiff's course of treatment, were not consistent with the severity of her allegations. Id. The ALJ noted that the Plaintiff's alleged symptoms of chronic diarrhea, fatigue, and pain, had not improved with the use of medication, and had resulted in side-effects causing the medication to be terminated. Id. However, the ALJ found that the Plaintiff's weight remained stable, that there were no concerns with malnutrition, and that her motor strength and range of motion remained good, with the exception of the problems that she had with the left shoulder, which had been treated with a cortisone shot, and physical therapy. Id. The ALJ went on to conclude that the Plaintiff also did not experience a level of fatigue that interfered with her ability to drive. Id.

With respect to the Plaintiff's claimed mental impairments, the ALJ concluded that the Plaintiff's symptoms were controlled with medication, that her symptoms improved with counseling, that there was no documented need for significant medication changes, that she did not report adverse side-effects, and that there was no need for increased counseling sessions, or evidence of decompensation. [T. 13-14].

In assessing the Plaintiff's credibility, the ALJ specifically noted his consideration of the Plaintiff's activities of daily living. [T. 14]. He determined that

the evidence revealed that the Plaintiff's daily activities varied with the severity of her daily symptoms, but that she "remained able to care for her personal hygiene, supervised her children (i.e. waking them in the morning, driving them to school, and occasionally picking them up after school activities or canceling these activities and notifying the school of the need for transportation), she prepared simple meals, did light housework, laundry, and grocery shopped, and she was able to stay alone during the day while her husband was at work." Id. He acknowledged that the Plaintiff performed those activities more slowly, and less frequently, than in the past, but concluded that she remained capable of completing many daily living activities, on a sustained, useful, and routine basis. Id.

In assessing the Plaintiff's credibility, the ALJ further observed that the Plaintiff had a consistent work history with the 3M Corporation, through the year 2001. Id. However, according to the ALJ, the Plaintiff had engaged in only sporadic employment, with a variety of employers, since her employment with 3M ended, and that she had not sought any vocational or rehabilitation training, in order to assist with employment opportunities. Id. Accordingly, the ALJ concluded that the evidence "d[id] not demonstrate a strong motivation to return to the workplace." Id.

The ALJ advised that he gave significant weight to the opinion of the State Agency medical consultants, who were of the opinion that the Plaintiff was capable of performing a light level of work, which was an opinion that the ALJ found to be well supported by the evidence. Id. The ALJ further advised that he gave greater credibility to the Plaintiff's subjective allegations than the State Agency medical consultants, even though he concluded that they were not entirely credible, as previously detailed. Id. Accordingly, the ALJ imposed further restrictions, in the performance of work, to include never climbing ladders, and only occasionally climbing stairs, balancing, stooping, kneeling, crouching, and crawling. Id.

The ALJ did not give controlling weight to the opinion of Dr. Stolpman, who was the Plaintiff's treating physician. Id. The ALJ noted that Dr. Stolpman believed that the Plaintiff could occasionally carry up to fifteen (15) pounds, frequently carry up to five (5) pounds, stand or walk for a total of only one (1) hour in an eight (8) hour workday, which was consistent with the ALJ's own findings. Id. However, Dr. Stolpman noted that the Plaintiff had an extreme limitation in her ability to cope with work-related stress, and the ALJ felt that a limitation of that nature would be incompatible with the ability to perform gainful employment. Id. The ALJ found that Dr. Stolpman's assessment was clearly based upon the Plaintiff's subjective

allegations, which the ALJ found to be not fully credible. Id. Accordingly, the ALJ found that Dr. Stolpman's assessment was "not well supported by clinical findings, laboratory diagnostic techniques, and [was] not consistent with other substantial evidence of record," and therefore, he did not give it controlling weight. Id.

In reaching his conclusion, the ALJ gave significant weight to the assessment of Dr. Karayusuf, an examining source, who restricted the Plaintiff to "simple, routine tasks (unskilled); occasional changes in a routine work setting; no interaction with the public; and only occasional interaction with coworkers or supervisors." [T. 15]. The ALJ noted that that assessment was also consistent with the State Agency medical consultants. Id.

The ALJ explained that he considered, but did not give controlling weight, to the opinion of Dr. Hjemboe, who is also a treating source. Id. The ALJ noted that Dr. Hjemboe asserted that the Plaintiff had a marked limitation in her ability to deal with work-related stress. Id. The ALJ acknowledged that the Plaintiff had difficulty in dealing with stress, but concluded that her limitations in concentration, persistence or pace, were only moderate, which he considered in restricting the Plaintiff to unskilled work that would involve occasional changes in the routine work setting, and in limiting her interaction with people. Id. He concluded that the Record as a whole

did not support a finding that the Plaintiff was markedly limited in her ability to deal with workplace stress.  Id.

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff could not perform her past relevant work, because he found that the Plaintiff was restricted to the performance of unskilled work, and that the Plaintiff's past relevant work exceeded that RFC.  [T. 15].  The ALJ further noted that the Plaintiff was fifty (50) years old on the alleged onset date, which is defined as an individual closely approaching advanced age, that she had a high school education, was able to communicate in English, and that there were no transferable jobs skills, since she would be restricted to unskilled work.  Id.

At the Fifth Step, the ALJ concluded that jobs existed in significant numbers in the national economy, which the Plaintiff would be capable of performing, based upon her age, education, work experience, and RFC.  [T. 15-16].  In drawing that conclusion, the ALJ noted that, if the Plaintiff had the RFC to perform the full range of light work, a finding that she was not disabled would be required. [T. 16].  The ALJ noted that, in this instance, additional limitations impeded the Plaintiff's ability to perform all, or substantially all, of the requirements of that level of work.  Id.

Accordingly, the ALJ asked the VE whether jobs existed in the national economy for an individual, who was the Plaintiff's age, education, work experience, and RFC.  Id.

The ALJ noted that the VE had testified that there were a significant number of jobs available in the regional economy of Minnesota, including 15,000 to 16,000 jobs as a cleaner; 9,000 to 10,000 jobs as an assembler; and 5,000 to 6,000 as a machine operator.  Id.  The ALJ found that the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles.  Id.  Based upon that testimony, and taking into consideration the Plaintiff's age, educational background, work experience, and RFC, the ALJ concluded that the Plaintiff was not under a disability, within the meaning of the Social Security Act, from March 6, 2007, the alleged onset date, through the date of his decision.  [T. 9, 16].

## IV.  Discussion

A.  Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir. 1997).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See,

Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998); Newton v. Chater, 92 F.3d 688, 692 (8th Cir. 1996), and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether or not substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001); Jackson v. Apfel, 162 F.3d 533, 536 (8th Cir. 1998); Black v. Apfel, 143 F.3d 383, 385 (8th Cir. 1998). Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."

Banks v. Massanari, 258 F.3d 820, 823 (8th Cir. 2001). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996); see also, Fenton v. Apfel, 149 F.3d 907, 911 (8th Cir. 1998); Scott v. Chater, 112 F.3d 367, 368 (8th Cir. 1997). Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result. See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions and, therefore, it embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal. See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v.

Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001). Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo. See, Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

Lastly, where, as here, the Plaintiff submits additional evidence to the Appeals Council for review, which was not considered by the ALJ, our task on review is not completed until we "determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000), quoting Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1999); see also, Flynn v. Chater, supra at 621-622. "Evaluating such evidence requires us to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing." Jenkins v. Apfel, 196 F.3d 922, 924 (8th Cir. 1999), citing Riley v. Shalala, supra at 622.

B.    Legal Analysis. In construing the Plaintiff's pro se Complaint, we understand her to be challenging the Commissioner's denial of benefits on the following grounds:

1.      Whether the ALJ conducted a proper credibility analysis, as it pertains to the Plaintiff's subjective complaints of her symptoms.

2.      Whether the action should be remanded, based upon her new evidence.

In our review of the Record, we have found that the ALJ made a critical error, which undermines his entire decision, by his apparent failure to consider the Plaintiff's diagnosis of fibromyalgia in any meaningful way.  Here, for reasons we will now detail, we find that the ALJ's analysis of the Record was so superficial, as to preclude an informed review of the bases for his decision, particularly with respect to his conclusions as to the Plaintiff's credibility, and his discrediting of her subjective complaints.  The ALJ's failure to fully and fairly consider all of the Plaintiff's impairments has led to a decision which is, in our judgment, unsupported by substantial evidence, and therefore, we agree that the ALJ erred, thereby resulting in our Recommendation that this matter be remanded to the Commissioner for further proceedings.

As a threshold matter, we address the ALJ's determination, that the Plaintiff's diagnosis of fibromyalgia was not a severe impairment.  In his decision, the ALJ advised that the Record documented a diagnosis of fibromyalgia, left shoulder

impingement, and that there were references to headaches and hearing loss. [T. 11]. However, he went on to conclude that "the record does not establish that these impairments have resulted in functional limitations of a 12 month duration," and therefore, he concluded, inexplicably, that those impairments, or combination of impairments, were not severe. Id.

At Step Two of the Five-Step Sequential Process, the ALJ must consider whether the Plaintiff "has a medically severe impairment that meets the duration requirement." Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006). To meet the durational requirement, a physical or mental impairment **must last or be expected to last** not less than twelve (12) months. Id., quoting Title 42 U.S.C. §423(d)(1)(A). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007), citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987); Title 20 C.F.R. §404.1521(a); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); Baker v. Apfel, 159 F.3d 1140, 1143 (8th Cir. 1998)  If an impairment would have no more than a minimal effect on the claimant's ability to work, then it is not severe. See, Page v. Astrue, 484 F.3d 1040,

1043 (8th Cir. 2007); Kirby v. Astrue, supra; Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991); SSR 96-3p.

It is the claimant's burden to establish that an impairment, or combination of impairments, is severe. See, Mittlestedt v. Apfel, 204 F.3d. 847, 852 (8th Cir. 2000). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." Kirby v. Astrue, supra at 708 [internal citation omitted]; Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997); Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996). Notably, the ALJ made no effort to explain, or to support, his conclusion that the Plaintiff's fibromyalgia was not severe. Indeed, it is not even clear that the ALJ considered whether the condition had more than a minimal effect upon the Plaintiff's ability to work.[28] Since the ALJ made no findings as to whether fibromyalgia would or would not have a minimal impact

---

[28]We have focused our analysis primarily on the ALJ's failure to consider fibromyalgia as a severe condition, in light of its primary impact upon the ALJ's credibility determinations and conclusions as to the genuineness of the Plaintiff's subjective complaints, as detailed herein. However, we note that, to the extent the ALJ has found other impairments to be "not severe," the ALJ also failed to support those conclusions with any explanation or evidence.

upon the Plaintiff's ability to work, we find that we are unable to review that portion of his decision for error.

Moreover, the ALJ's conclusion, that her fibromyalgia would not meet the durational requirement, is perplexing. Significantly, the durational requirement is not only met when an impairment has lasted twelve (12) months, but also when the impairment **is expected to last** more than twelve (12) months. Inexplicably, and without explanation, the ALJ appears to disregard the two-pronged nature of the durational requirement and, to the extent that he may be implicitly finding that the Plaintiff's diagnosis of fibromyalgia is not expected to last more than a year, we find such a determination unsupported by substantial evidence of Record, as far as we can tell. Indeed, we are not aware of any opinion, or medical evidence in the Record, that would support an inference, let alone a finding, that the Plaintiff's diagnosis was not expected to last more than a year.

"Fibromyalgia is a **chronic condition**, usually diagnosed after eliminating other conditions, for which no confirming diagnostic tests exist." Ritchey v. Barnhart, 2005 WL 6117485 at *12 (E.D. Mo., September 6, 2005)[emphasis added], citing Forehand v Barnhart, 364 F.3d 984, 987-988 (8th Cir. 2004)(holding that the Plaintiff's subjective complaints were consistent with the majority of her physicians' reports, and

finding that the ALJ erred by disregarding her testimony and the opinion of her treating physician). Here, the ALJ made no attempt to explain why a characteristically chronic condition was not expected to last more than year. As pertinent here, our Court of Appeals has recognized "that fibromyalgia can be disabling because of its potential for sleep derangement and resulting daytime fatigue and pain." Brosnahan v. Barnhart, 336 F.3d 671, 678 (8th Cir. 2003), citing Kelley v. Callahan, 113 F.3d 583, 589 (8th Cir. 1998); Cline v. Sullivan, 939 F.2d 560, 567 (8th Cir. 1991)(recognizing that fibromyalgia can be disabling); Forehand v. Barnhart, supra. Accordingly, we find that the ALJ erred in not affording due consideration to the Plaintiff's documented diagnosis of fibromyalgia, and in failing to explain any competent basis for concluding that that impairment was not severe.

The Court of Appeals for the Eighth Circuit has held that an ALJ's erroneous failure, at Step Two, to include an impairment as a severe impairment, will warrant a reversal and remand, even where the ALJ found other impairments to be severe. See, Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007)(holding that an error in failing to treat claimant's borderline intellectual functioning as a severe impairment at Step Two was not harmless error); see also, Lamorte v. Astrue, 2009 WL 3698004 at *4-5 (W.D. Ark., November 2, 2009)(recognizing that the Eighth Circuit has found that,

"if the ALJ errs by finding a severe impairment is not severe, the ALJ's disability determination must be reversed and remanded," and finding that the ALJ erred in finding that claimant's fibromyalgia was non-severe); <u>Garza v. Barnhart</u>, 397 F.3d 1087, 1089 (8th Cir. 2005)(ALJ erred in concluding fibromyalgia was not severe and remanding for reconsideration of the claimant's fibromyalgia diagnosis and its related limitations); cf., <u>Pirtle v. Astrue</u>, 479 F.3d 931, 935 (8th Cir. 2007)(where ALJ properly found fibromyalgia to be a severe impairment, properly analyzed and considered the severity of the condition, and took it into account in determining the claimant's RFC, there was no error).

While we are convinced that the ALJ's failure to conduct a proper evaluation at Step Two, by itself, warrants a remand, nonetheless, in the interests of completeness, we address the Plaintiff's other claims, as they may assist in the consideration of her request for benefits, if our Recommendation is adopted.

        1.    <u>Whether the ALJ Conducted a Proper Analysis Pursuant to the Requirements of Polaski v. Heckler</u>?

        a)    <u>Standard of Review</u>.  The governing law makes clear that credibility determinations are initially within the province of the ALJ.  <u>Driggins v. Bowen</u>, 791 F.2d 121, 124 n. 2 (8th Cir. 1986); <u>Underwood v. Bowen</u>, 807 F.2d 141,

143 (8th Cir. 1986). As a finding of fact, the determination must be supported by substantial evidence on the Record as a whole. See, <u>Stout v. Shalala</u>, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the Plaintiff's testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, <u>Shelton v. Chater</u>, 87 F.3d 992, 995 (8th Cir. 1996); <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Ricketts v. Secretary of Health and Human Services</u>, 902 F.2d 661, 664 (8th Cir. 1990). Those requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ. <u>Johnson v. Secretary of Health and Human Services</u>, 872 F.2d 810, 814 n. 3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984), and its progeny. See, e.g., <u>Ostronski v. Chater</u>, 94 F.3d 413, 418-419 (8th Cir. 1996); <u>Shelton v. Chater</u>, supra; <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996). Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the

Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

> 1.    the claimant's daily activities;
> 2.    the duration, frequency, and intensity of the subjective symptoms;
>
> 3.    precipitating and aggravating factors;
> 4.    dosage, effectiveness and side effects of medication; and
>
> 5.    functional restrictions.

Polaski v. Heckler, supra at 1322.

The ALJ must not only consider these factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole. Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990).

It is well-settled that an ALJ may not disregard a claimant's subjective complaints of pain or other subjective symptoms solely because there is no objective medical evidence to support them. Jones v. Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1995)(ALJ should consider absence of objective medical basis as a factor to discount the severity of a claimant's subjective complaints of pain). It is also firmly established that the physiological, functional, and

psychological consequences of illness, and of injury, may vary from individual to individual.  Simonson v. Schweiker, 699 F.2d 426, 429 (8th Cir. 1983).  For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition * * * is generally deteriorated."  O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983).  Given this variability, an ALJ may discredit subjective complaints only if those complaints are inconsistent with the Record as a whole.  Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997).

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied.  For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling.  Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).  By the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility."  Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997)(ALJ may

discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487. Among the daily activities, which contradict disabling pain, are: a practice of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; and grocery shopping, Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996). Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain. Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

b) Legal Analysis. In arriving at the Plaintiff's RFC, the ALJ found that her subjective complaints were not entirely credible, when considered against the Record as a whole. In particular, the ALJ found the credibility of the Plaintiff, as to the severity of her impairments and symptoms, to be undermined by her medical records and course of treatment, her daily living activities, and her sporadic work history in the years before her claim for disability benefits. However, we find that the ALJ's credibility determination is not supported by substantial evidence.

At the outset, we recognize that the ALJ's decision is facially compliant with the requirements of Polaski, since it discusses a number of the relevant factors. However, the ALJ's approach is too cursory, and thereby, is impenetrable to any

principled review. Notwithstanding the ALJ's recitation of evidence in support of a number of the Polaski factors, the resulting analysis lacks any evidence of careful attention to the Record. In finding that the ALJ did not conduct a proper credibility analysis, we have taken particular note of his finding that the Plaintiff's fibromyalgia impairment was not severe, a determination, for reasons we have already addressed, that we find problematic. Having given so little consideration to the Plaintiff's diagnosis of fibromyalgia at the outset, we can find no indication that the ALJ seriously considered that condition in conjunction with his evaluation of the Plaintiff's subjective complaints, when making his credibility determination. In this, we find error.

In discounting the Plaintiff's subjective complaints, the ALJ noted that the Plaintiff's physical impairments included collagenous colitis, but that her course of treatment was inconsistent with the severity of her allegations. Specifically, the ALJ cited to medical reports which revealed that, notwithstanding the Plaintiff's subjective complaints, she experienced no weight loss, no malnutrition, her motor strength and range of motion remained good, and her fatigue was not so severe as to interfere with her ability to drive. [T. 13].

Notably, rather than address the entire Record, and isolate potential sources for the Plaintiff's complaints, including other diagnoses, the ALJ appears to have addressed the severity of the Plaintiff's physical symptoms, only in connection with the potentiality that they could be as severe as she complained, as a result of her diagnosis of collagenous colitis. Id. He fails to acknowledge, or seriously consider -- at least as far as this Record discloses -- that a number of the Plaintiff's symptoms are often associated with a diagnosis of fibromyalgia, and that are often difficult to support through objective medical findings. In light of the ALJ's perfunctory assessment of that condition from the outset, his failure to address the condition, in connection with his evaluation of the medical evidence supporting the severity of her symptoms, is troubling.

Fibromyalgia is an illness, the cause of which is unknown, and which may be described as follows:

> Fibromyalgia * * * [is] characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissues. Diagnosis is clinical. Treatment includes exercise, local heat, and drugs for pain and sleep.

*     *     *

Stiffness and pain in fibromyalgia frequently begin gradually, diffusely, and with an achy quality. Symptoms can be exacerbated by environmental or emotional stress, poor sleep, trauma, exposure to dampness or cold, or by a physician who gives the patient the incorrect message that it is "all in the head." Patients tend to be stressed, tense, anxious, fatigued, striving and sometimes depressed. Many patients also have irritable bowel symptoms or tension headaches.

Fibromyalgia is suspected in patients with generalized pain and tenderness, especially disproportionate to the physical findings; with negative laboratory results despite widespread symptoms; or when fatigue is the predominant symptom.

The Merck Manual, at p. 321 (18th Ed. 2006).

The Courts have advised that, "given the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." Rogers v. Commissioner of Social Security, 486 F.3d 234, 248 (6th Cir. 2007)(noting that "the nature of fibromyalgia itself renders such a brief analysis and over-emphasis upon objective findings inappropriate."); Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009)("Fibromyalgia is an elusive diagnosis; '[i]ts cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.'"), quoting Sarchet v. Chater, 78 F.3d 305, 306 (7th

Cir. 1996); <u>Swain v. Commissioner of Social Security</u>, 297 F. Supp.2d 986, 990 (N.D. Ohio 2003)("There is no laboratory test for the disease's presence or severity," and "[p]hysical examinations usually yield normal findings in terms of full range of motion, no joint swelling, normal muscle strength, and normal neurological reactions.")[citations omitted]; <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005)(the hallmark of fibromyalgia is a lack of objective evidence); <u>Garza v. Barnhart</u>, supra at 1089 (fibromyalgia is difficult to diagnose, chronic, and may be disabling).

The appraisal of the potentially debilitating impact of fibromyalgia has proved to be a difficult task for physicians, as well as those Courts that have been called upon to review a claimant's entitlement to benefits related to an asserted disability. See, <u>Kelley v. Callahan</u>, supra at 588-590 (finding that the ALJ erred in discounting the claimant's subjective complaints of pain where claimant's principal diagnosis was fibromyalgia); <u>Johnson v. Astrue</u>, 2009 WL 2256693 at *10-11 (D. Neb., July 29, 2009)(remanding for further consideration where ALJ's determination, that the claimant's subjective statements regarding her fibromyalgia were not credible, was not supported by substantial evidence); <u>Ritchey v. Barnhart</u>, 2005 WL 6117485 at *11-13 (E.D. Mo., September 6, 2005); <u>Brosnahan v. Barnhart</u>, supra at 677-678; <u>Abbott v.</u>

Massanari, 2002 WL 87063 at *3-8 (D. Neb., January 23, 2002).  Here, we do not question the ALJ's factual findings, as to the Plaintiff's weight, nutrition, motor strength, and range of motion.

However, given that the Plaintiff is alleging numerous symptoms, and has more than one physical impairment, exactly how those factual findings relate, in any meaningful way to the Plaintiff's symptoms, is undeveloped in this Record.  We can find no clear showing that the ALJ considered that many of the Plaintiff's subjective complaints might be directly related to her diagnosis of fibromyalgia, which might also partially explain the  lack of objective medical evidence supporting the severity of some of those symptoms which are not particularly regarded as descriptors for the disease.  Given the ALJ's failure to adequately explain his findings, with respect to the severity of her symptoms, we are left with the distinct impression that the ALJ did not meaningfully consider the Plaintiff's fibromyalgia at all.

We further note that, as but one example of what appears to be a superficial review of that aspect of the Record, the ALJ concludes that the Plaintiff's fatigue does not interfere with her ability to drive, but he fails to address those portions of the Record, which reflect that the Plaintiff has consistently asserted that she does not drive when she is experiencing fatigue, that she only drives short distances because of her

pain, and further, that there have been instances where she was unable to attend appointments due to her inability to drive. [T. 33, 154, 194, 203]. Moreover, the Plaintiff has complained that she often cannot get out of bed -- as much as two (2) times per week. [T. 34]. Those portions of the Record certainly call into question the Plaintiff's ability to consistently perform work-related activities, in the competitive world of the workplace, and the ALJ should have addressed them.

We acknowledge that our function, on review, is not to ferret out any counter-indicative evidence, but rather, is to assure that the ALJ's rejection of a claimant's complaints is for good and explicit reasons, and that conflicts in the evidence are resolved, in the first instance, by the ALJ. See, Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). Here, however, the ALJ's reasons for concluding, that the Plaintiff's fatigue did not interfere with her driving, is simply unclear, and enigmatic. His failure to resolve conflicting evidence, or even to address the conflict, for that matter, undermines the resulting credibility determination.

Moreover, with respect to the Plaintiff's abilities to engage in daily life activities, "[w]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." Forehand

v. Barnhart, supra at 988, quoting Brosnahan v. Barnhard, supra at 677; Tilley v. Astrue, supra at 681; Kelley v. Callahan, supra at 588-589 (noting that the Eighth Circuit "has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity."), citing Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995)("We have repeatedly stated that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."); Harris v. Secretary of DHHS, 959 F.2d 723, 726 (8th Cir. 1992); Thomas v. Sullivan, supra at 669.

While we recognize that the Plaintiff's ability to engage in daily living activities is certainly relevant, here we are left with the firm belief that the ALJ did not seriously consider the Plaintiff's claims, as to the nature and extent of those activities.  For instance, the ALJ notes that the Plaintiff was able to cook, do light housework and laundry, and that she was able to grocery shop.  [T. 14].  However, there is substantial evidence that the Plaintiff needs considerable assistance in those activities, that her husband does most of the household chores, and that she has hired someone to clean her house.  [T. 34, 188, 193, 197, 202-204, 229].  Moreover, the Record contains

evidence that the Plaintiff is no longer able to do her own grocery shopping. [T. 193, 381].

Given these significant gaps in the ALJ's analysis of the Record, we are unable to conclude that the ALJ's decision, as to the extent of the Plaintiff's daily living activities, is supported by substantial evidence in the Record. The decision of the ALJ appears to ignore those portions of the Record which reveal very limited daily activities on the part of the Plaintiff, and frankly, the Record was not meaningfully developed by either the ALJ, or counsel for the Plaintiff, as to the scope, intensity, or duration, of the Plaintiff's household activities, during the course of the Hearing.

Accordingly, we cannot fully credit the ALJ's decision, since he has failed to address critical evidence in the Record, which would suggest that the Plaintiff does not engage in the level of daily living activities, that the ALJ has attributed to her, and therefore, we conclude that the ALJ did not seriously consider the Plaintiff's testimony regarding the assertedly disabling nature of her symptoms.[29]  Cf., <u>Johnson</u>

_____

[29]We have not found any error in the ALJ's contention that the Plaintiff's work history, since 2001, demonstrates a lack of strong motivation to return to the workplace. [T. 14].  However, we cannot conclude that this inference, standing alone, is enough to sustain a credibility determination, which partially discredits a claimant's allegations as to the severity of her symptoms.  As we have detailed, the ALJ's other reasons for discrediting the severity of her symptoms lack substantial support in the Record, and demonstrate a failure to seriously consider the Plaintiff's allegations, and

v. Apfel, supra at 1148 ("We will not disturb the decision of an [ALJ] who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain."), quoting Pena v. Chater, supra at 908. Here, we cannot conclude that he seriously considered that evidence.

We are mindful of the evidence in the Record, upon which the ALJ apparently relied, which indicates that the Plaintiff may have a tendency to exaggerate or focus on the physical symptoms of her illnesses. [T. 343, 380, 392, 525]. However, we note that those opinions generally predate the Plaintiff's diagnosis of fibromyalgia, and fail to acknowledge it or, for that matter, discredit it as a medical basis for her symptoms.[30]

_____

therefore, we find reversible error.

[30]The Plaintiff was initially diagnosed with fibromyalgia in or around September of 2007. In assessing the Plaintiff's functional capacity, the ALJ noted that he gave "significant weight" to the opinions of the State Agency medical consultants. [T. 14]. Of note, the first assessment by a State Agency physician was conducted on June 21, 2007, which was several months before the Plaintiff was diagnosed with fibromyalgia. [T. 338-345]. Notably, Dr. Salmi, another State Agency Physician, conducted a Physical Residual Functional Capacity Assessment on October 29, 2007, at which time, he affirmed the prior assessment of June 21, 2007. [T. 405-407]. While Dr. Salmi noted a diagnosis of fibromyalgia in his decision of October 29, 2007, he also concluded that "there were no new allegations." Id. Although Dr. Salmi apparently acknowledged the diagnosis, it is unclear whether he was able to review any new evidence or medical records, that were related to that diagnosis, or that he considered the diagnosis in making his assessment, in light of his assertion that there were no new allegations. The ALJ should have further developed the issue, and his failure to seek clarification, in light of his reliance upon those opinions, again

Moreover, the ALJ did not make any inquiry to the State Agency physicians, as to the potential that the Plaintiff's perceived somatic tendencies could be interrelated with the diagnosis of fibromyalgia, or to assess whether that would impact upon any prior disability assessments.

Quite plainly, the ALJ did not find the Plaintiff's subjective allegations credible, but that does not relieve him of his duty to seriously consider the entire Record. We do not conclude that the claimant with a diagnosis of fibromyalgia gets a free pass under the Social Security disability laws, for that is not the case. Indeed, we cannot say, here, that the ALJ was wrong in partially discrediting the Plaintiff's subjective complaints, but we do find unsettling the ALJ's apparent failure to view the evidence in its entirety, and in particular, to consider the effects of later developed evidence. We also allow for the fact that the ALJ may have been correct in concluding that the Plaintiff's diagnosis of fibromyalgia does not fully explain her subjective complaints, but we cannot accept that leap of logic when there is nothing in the Record to explain the need for, or legal propriety of, the substantial distance being hurdled. Here, such a determination was not made, and we are left with the firm and distinct conclusion that the ALJ's credibility determination did not properly

undermines his decision.

consider the Record as a whole, and therefore, we cannot find that it is supported by substantial evidence.

Accordingly, we find that the ALJ erroneously rejected the medical evidence of Record, which substantiates a diagnosis of fibromyalgia, and unfairly undercut the Plaintiff's credibility, without any proper consideration of all of the evidence. Moreover, the fatal errors we have identified undermine the validity of the ALJ's other areas of analysis. "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some evidence of the claimant's ability to function in the workplace." Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008), quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). "With th[ose] central and potentially dispositive issue[s] unexplained by the ALJ, we have no confidence in the reliability of the RFC upon which the ALJ based his decision." Snead v. Barnhart, 360 F.3d 834, 839 (8th Cir. 2004)(remanding where ALJ failed to incorporate evidence related to chronic heart condition into the hypothetical to the VE). The same may legitimately be said, here, where the ALJ failed to properly and fully consider the functional limitations resulting from fibromyalgia, in addition to the other physical impairments that were demonstrated in the Record. Cf., Garza v. Barnhart, supra at 1089(noting that, while the ALJ's RFC findings were consistent with reviewing State

Agency Physician, those findings were made prior to claimant's diagnosis of fibromyalgia); Forehand v. Barnhart, supra at 988 (advising that, in a fibromyalgia case, the RFC determination requires a consideration of whether the claimant can perform the requisite physical acts on a daily basis in the sometimes competitive and stressful conditions of the workplace).

Moreover, the Record clearly alerted the ALJ to the Plaintiff's diagnosis, and he should have fully and fairly developed the Record, so as to address its potential impact on earlier findings of those State Agency physicians to whom he gave significant weight in determining the RFC. It is well-established that "[t]he ALJ has the duty to develop the record fully and fairly, even where, as here, the claimant is represented by counsel." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000), citing Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985). In addition, our Court of Appeals has held "that a remand is appropriate where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit this Court to conclude that substantial evidence supports the Commissioner's decision." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 822-823 (8th Cir. 2008), citing Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir. 2005), as "remanding because the ALJ's factual findings

were insufficient for meaningful appellate review," and <u>Pettit v. Apfel</u>, 218 F.3d 901, 903-04 (8th Cir. 2000)(same).

"While a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding, where the deficiency [has] no practical effect on the outcome of the case,' inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis to remand." <u>Draper v. Barnhart</u>, 425 F.3d 1127, 1130 (8th Cir. 2005), quoting <u>Reeder v. Apfel</u>, 214 F.3d 984, 988 (8th Cir. 2000); see also, <u>Boyd v. Sullivan</u>, 960 F.2d 733, 736 (8th Cir. 1992). Here, the ALJ failed to develop the Record, as to the effect that the Plaintiff's diagnosis of fibromyalgia would have on the State Agency assessments that were provided, to which the ALJ gave significant weight. If the ALJ had given proper consideration, and fairly developed the Record regarding this issue, the evidence had the clear potential of affecting the ultimate disability determination, such that the failure to elicit the necessary evidence, or complete the required analysis, prejudiced the Plaintiff in the proceedings below. <u>Snead v. Branhart</u>, supra at 839, citing <u>Shannon v. Chater</u>, supra at 488. Therefore, we recommend a reversal and remand as the evidence of Record, and that subsequently added by the Plaintiff warrant a genuine, and thoughtful, assessment in the first instance, which was not performed below.

2.	Whether the New Evidence Submitted by the
	Plaintiff Warrants a Remand.

	a)	Standard of Review.  The Social Security Act generally precludes the District Court's consideration of evidence, upon review of the Commissioner's determination, which is outside of the Record that was before the Commissioner.  See, Title 42 U.S.C. §405(g); see also, Delrosa v. Sullivan, supra at 483.  In pertinent part, Section 405(g) provides, as follows:

> The court may * * * at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding * * *.

Furthermore, "'[t]o be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which the benefits were denied, and there must be a reasonable likelihood that it would have changed the [Commissioner's] determination.'"  Hinchey v. Shalala, 29 F.3d 428, 432-33 (8th Cir. 1994), quoting Woolf v. Shalala, supra at 1215; see also, Goad v. Shalala, 7 F.3d 1397, 1398 (8th Cir. 1993)("Under [S]ection 405(g), however, the evidence must also be material, and medical evidence meets this requirement 'if it relates to the claimant's

condition on or before the date of the ALJ's decision.'"), quoting <u>Williams v. Sullivan</u>, 905 F.2d 214, 216 (8th Cir. 1990).

"Furthermore, it must be reasonably likely that the Commissioner's consideration of this new evidence would have resulted in an award of benefits." <u>Jones v. Callahan</u>, 122 F.3d 1148, 1154 (8th Cir. 1997), citing <u>Woolf v. Shalala</u>, supra at 1215. As the Court explained, in <u>Jones</u>:

> An implicit requirement is that the new evidence pertain to the time period for which benefits are sought, and that it not concern later-acquired disabilities or subsequent deterioration of a previously non-disabling condition. See, Goad v. Shalala, 7 F.3d 1397, 1398 (8th Cir. 1993)(per curiam); Thomas v. Sullivan, 928 F.2d [255], at 260-61 [(8th Cir. 1991)]. Additional evidence showing a deterioration in a claimant's condition significantly after the date of the Commissioner's final decision is not a material basis for remand, although it may be grounds for a new application for benefits.

<u>Id.</u>; see also, <u>Estes v. Barnhart</u>, supra at 725-726; <u>Rehder v. Apfel</u>, 205 F.3d 1056, 1061 (8th Cir. 2000).

        b)    <u>Legal Analysis</u>. The Plaintiff argues that the subsequent award of benefits, along with the additional medical records submitted to this Court, warrant a remand pursuant to Sentence Six of Section 405(g).

We have considered the subsequent award of benefits to the Plaintiff, as of July 18, 2008, which, as we have noted, is one day prior to the ALJ's decision. A number

of Courts have found that a grant of benefits, in a subsequent application for DIB with an onset date in close proximity to the first application, is new and material evidence warranting a remand.  See, Hayes v. Astrue, 488 F. Supp.2d 560, 565 (W.D. Va. 2007)("[W]here second social security application finds a disability commencing at or near the time a decision on a previous application found no such disability, the subsequent finding of a disability may constitute new and material evidence."); Luna v. Astrue, 2008 WL 2559400 at *2 (D. Ariz., June 23, 2008) ("Where a second social security application finds a disability commencing at or near the time a decision on a previous application found no such disability, the subsequent finding may constitute new and material evidence."); Reichard v. Barnhart, 285 F. Supp.2d. 728, 734 (S.D. W. Va. 2003)(holding that the Commissioner's subsequent finding of disability, which commences less than a week later than when the claimant was found to be not disabled, was new and material evidence); Graham v. McMahon, 2007 WL 2021893 at *2 (W.D. Va., July 6, 2007); but see, Allen v. Commissioner of Social Security, 561 F.3d 646, 654 (6th Cir. 2009)(remand is not warranted on the basis of subsequent grant of benefits, by itself, since the subsequent grant of benefits may be based upon a new age classification, a worsening of the claimant's condition, or some other change); Bruton v. Massanari, 268 F.3d 824, 827 (9th Cir. 2001)(finding that award of benefits

under subsequent application was not new evidence warranting remand where different medical evidence, different time period, and different age classification were involved); <u>Hodge v. Astrue</u>, 2008 WL 4561601 at *1-3 (D. Minn., October 10, 2008)(rejecting Magistrate Judge's Report and Recommendation to remand in light of subsequent grant of benefits where the subsequent decision was a part of the Administrative Record, and the Appeals Council expressly rejected that the subsequent decision changed the prior evaluation).

Here, the subsequent decision granting benefits is not in the Record, and therefore, we cannot determine the evidentiary basis upon which the Commissioner based that decision. The Commissioner submits that the finding that the Plaintiff was disabled, one (1) day prior to the ALJ's decision, was based upon the Plaintiff's alleged onset date in her application, and a lack of awareness of the ALJ's decision of July 19, 2008. In view of the lack of a reliable showing before us, we cannot say that the subsequent award of benefits is, in and of itself, a ground for remand, since the Plaintiff has not articulated, nor is it apparent, whether that decision would undermine any previous decision, since it may actually relate to a deterioration in her condition, or to some other intervening cause. Accordingly, insofar as the Plaintiff seeks a remand based upon a subsequent grant of benefits, standing alone and without

any opportunity to consider the basis for that grant, we are unable to find that the grant constitutes new evidence. Simply, the temporal proximity of that grant gives us pause, but we require evidence, not mere proximity, to be the critical factor in this analysis, and do not recommend a remand on this basis.

With respect to the other evidence that the Plaintiff has submitted, we do not find that a Sentence Four remand would be warranted on that basis. First, a number of the documents are either cumulative or irrelevant. Second, the Plaintiff has not established good cause for failing to submit the new evidence in the proceedings below, since her only justification is that she trusted her attorney to submit the documents in question. Nevertheless, it is well-established that, where a claimant has a full opportunity to develop the Record before the Administrative Record closes, but fails to do so, he or she cannot show good cause for failing to incorporate that "new" evidence. See, Sullins v. Shalala, 25 F.3d 601, 605 n.6 (8th Cir. 1994), cert. denied, 513 U.S. 1076 (1995), citing Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993); Mouser v. Astrue, 545 F.3d 634, 637 (8th Cir. 2008)("Although we have held that good cause is established where the condition and associated records did not exist at the time of the hearing, here it is only the associated records that were

lacking.")[internal citation omitted]; <u>Hepp v. Astrue</u>, 511 F.3d 798, 808 (8th Cir. 2008).

Here, the ALJ expressly noted that the Plaintiff could submit additional evidence following the Hearing, so she clearly had the opportunity to supplement that which was in the Record at the time of the Hearing. [T. 28]. Accordingly, we are unpersuaded that the Plaintiff has shown good cause for her failure to incorporate the records that she has now submitted to the Court, into the Record below.[31] As such, while we ultimately recommend a remand, we do not do so because of any "new" evidence, but because the ALJ's decision was deficient, for reasons we have detailed herein. Of course, the issue is largely mooted since, on remand, the Plaintiff will have the opportunity to proffer the evidence to an ALJ who will consider its admissibility at that time.

Accordingly, we recommend that the parties' cross-Motions for Summary Judgment be denied. While we have found error in the ALJ's decision, this is not a

---

[31]To the extent that the Plaintiff has submitted records that were not in existence at the time of the ALJ's decision, most of the records are cumulative. We note that the Dr. Britton's assessment of August 18, 2008, is not cumulative, but the Plaintiff was being treated by him well before the ALJ rendered his decision, and therefore, any failure to obtain his assessment, and submit it to the ALJ, was not supported by good cause.

situation where "the record 'overwhelmingly supports'" an immediate finding of disability. See, <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1011 (8th Cir. 2006), quoting <u>Thompson v. Sullivan</u>, 957 F.2d 611, 614 (8th Cir. 1992). Rather, we find that it is appropriate to remand this case to the Commissioner, pursuant to Sentence Four of Title 42 U.S.C. §405(g), for further proceedings, not inconsistent with this Recommendation.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion for Summary Judgment [Docket No. 24] be denied.

2.      That the Defendant's Motion for Summary Judgment [Docket No. 29] be denied.

3.      That this matter be remanded to the Commissioner for further proceedings, in accordance with this Report, pursuant to Sentence 4 of Title 42 U.S.C. §405(g), and that Judgment should be entered accordingly.

4.      That, pursuant to the holding in <u>Shalala v. Schaefer</u>, 509 U.S. 292, 297 (1993), Judgment be entered accordingly.

Dated:  February 16, 2010            s/Raymond L. Erickson
                                     Raymond L. Erickson
                                     CHIEF U.S. MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 2, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than March 2, 2010**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.